# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 9, 2017          Decided July 14, 2017

No. 15-1274

ORANGEBURG, SOUTH CAROLINA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*James N. Horwood* argued the cause for petitioner. With him on the briefs were *Peter J. Hopkins* and *Jessica R. Bell*.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Robert H. Solomon*, Solicitor, and *Karin L. Larson*, Attorney.

Before: MILLETT and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Orangeburg, South Carolina, a city of approximately 14,000 residents, has been trying to cut a better deal for wholesale power.  The South Carolina city located a willing supplier in neighboring North Carolina but, according to Orangeburg, the deal was scuttled by the North Carolina Utilities Commission ("NCUC"), the state agency overseeing retail power sales in North Carolina.  The Federal Power Act leaves regulatory authority over *retail* power sales to state agencies like NCUC, while reserving authority over interstate *wholesale* power sales to the Federal Energy Regulatory Commission ("FERC" or "Commission").  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766 (2016).  Orangeburg alleges that, in exercising its *retail* ratemaking authority, NCUC has interposed itself as a gatekeeper for access to North Carolina's most affordable and reliable *wholesale* power, thereby intruding upon FERC's exclusive jurisdiction.  In other words, this case presents one in "a steady flow of jurisdictional disputes" caused by, "in point of fact if not of law," the reality that "the wholesale and retail markets in electricity are inextricably linked."  *Id.*

Orangeburg now challenges FERC's approval of an agreement between two utilities.  According to Orangeburg, FERC's approval of that agreement constitutes an authorization of NCUC's unlawful regime.  We hold that Orangeburg has standing to challenge FERC's approval because, among other reasons, the city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power), and because that injury is fairly traceable to the Commission's approval of the agreement at issue.  This is especially true in light of the unique circumstances of this case:  FERC has repeatedly sidestepped the legal issues raised by Orangeburg, thereby acquiescing to the gatekeeping regime allegedly causing the city's injury.  On the merits, we conclude that FERC failed to justify its approval

of the agreement's disparate treatment of wholesale ratepayers; to justify the disparity, the Commission relied exclusively on one line from a previous FERC order that, without additional explication, appears either unresponsive or legally unsound. Accordingly, we vacate in part the orders approving the agreement and denying rehearing, and remand to the Commission for further explanation.

## I.

### A.

After nearly 100 years of purchasing its wholesale power from the same utility, Orangeburg tried to cut a better deal. In 2005, in anticipation of the expiration of its existing contract, Orangeburg informally sought proposals from new power suppliers. Only one new supplier submitted a proposal: Duke Energy Carolinas, LLC ("Duke"). In 2008, Orangeburg opted to switch from its old supplier over to Duke, signing an agreement for Duke to satisfy the city's wholesale power needs for approximately ten years.

Under the agreement, Duke would have treated Orangeburg as a native-load customer. "Native load" is an industry term for customers to whom a power supplier has undertaken a long-term legal obligation to construct and operate its system to serve. 18 C.F.R. § 33.3(d)(4)(i). In practice, a great deal rides on native-load status and the question of who is, or is not, considered a "native-load customer" is at the heart of the instant petition. For instance, as a native-load customer, Orangeburg would pay a lower rate for wholesale power: the city would pay a rate based on the lower "system average costs," instead of the higher "incremental costs." Orangeburg anticipated that, as a native-load customer under this agreement, the city would have been

able to pass on approximately $10 million in savings per year to its own retail customers.

But the agreement faced a significant hurdle: NCUC, the state agency overseeing retail power sales in North Carolina. Years earlier, as a condition for approving Duke's merger with another utility, NCUC imposed several regulatory conditions on Duke's future power sales. *See Order Approving Merger Subject to Regulatory Conditions and Code of Conduct*, Docket No. E-7, Sub 795, 2006 N.C. PUC LEXIS 296, at *200-19 (N.C. Utils. Comm'n Mar. 24, 2006). As relevant here, NCUC imposed, and Duke accepted, two sets of conditions. First, Duke agreed to continue serving its "lowest-cost power" to *retail* native-load customers in North Carolina, and to plan its system with an eye toward providing those customers the most reliable and lowest cost power. *Id.* at *206-07 (Regulatory Conditions 5 and 6). Second, Duke agreed to provide notice to NCUC if the utility intended to treat any new *wholesale* customer as a native-load customer, and NCUC reserved the right to decide for itself whether to recognize that native-load status when it came to its own retail ratemaking, accounting, and reporting. *Id.* at *207-12 (Regulatory Condition 7).

Accordingly, when Duke agreed to treat Orangeburg as a native-load wholesale customer, Duke notified NCUC. In response, NCUC issued a declaratory ruling that "[i]n any future retail ratemaking proceeding," the commission would *not* recognize Orangeburg's native-load status and, consequently, would account for Duke's revenue from Orangeburg as though it were "based upon incremental costs," instead of the lower "system average costs" provided for in the agreement. *Order on Advance Notice and Joint Petition for Declaratory Ruling*, Docket No. E-7, Sub 858, 2009 WL 904943 (N.C. Utils. Comm'n Mar. 30, 2009) (hereinafter, "*2009 NCUC Declaratory Ruling*"), J.A. 207. In other words,

when NCUC set rates for North Carolina *retail* customers, it would act as though Duke were receiving more *wholesale* revenue from Orangeburg than it actually was; the commission would "impute" revenue. This ostensibly minor accounting decision regarding *retail* power sales within North Carolina had a major impact on the Duke-Orangeburg *wholesale* power deal.

The mechanics of how this imputation in one domain (retail) can affect another domain (wholesale) is not plainly obvious, and so an analogy will hopefully help. Consider the following. A North Carolina university program costs $500 per month to maintain. A state agency mandates that students born in North Carolina must be charged the lowest rate possible, in light of the $500-per-month cost. The program has four current students, each of whom was born in North Carolina. Accordingly, the agency permits the university to collect $125 from each student ($500 divided by four). The next month, the program enrolls a fifth student who was born in *South Carolina*, promising to treat her the same as the current North Carolina-born students. Under this arrangement, the university would collect $100 from each student ($500 divided by five). But the state agency then declares that, in calculating the appropriate fees for the four *North Carolina* students, it would impute an amount of $300 – not $100 – as the fees collected from the new *South Carolina* student. Based on the agency's accounting, the North Carolina students would pay only $50 each ($500 cost minus $300 in imputed revenue, with the difference of $200 divided by the four North Carolina students). If the university were to stick to the agreement to treat the fifth student the same as the first four, it would collect only $250 in total fees ($50 from each of the five students). The difference between the $500 cost and the $250 in actual revenue are "trapped costs," and those trapped costs render the new agreement economically infeasible. The university, acting

rationally, would try to get out of its agreement with the fifth student from South Carolina. The key lesson to draw is this: even if the state agency neither enjoys nor exercises direct regulatory authority over the *South Carolina* student's fees, the agency can nonetheless frustrate the deal struck by the university and the new student.

Something similar happened here, according to Orangeburg. The 2009 NCUC Declaratory Ruling provided that the state commission would, for North Carolina retail ratemaking purposes, decline to treat Orangeburg – a South Carolina wholesale customer – as native load. The critical fact is that native-load customers enjoyed a special, lower rate (based on system average, not incremental, costs). Consequently, when NCUC set rates for *retail* customers, the state commission would account for revenue from Orangeburg as being greater than Duke actually collected. The difference between the higher, imputed amount and the lower, agreed-upon amount generated "trapped costs," which soured the whole Duke-Orangeburg deal. Shortly after the 2009 NCUC Declaratory Ruling, Duke invoked a "regulatory out" provision (*i.e.*, an escape clause) in the agreement. Consequently, Orangeburg was forced to return to its old power supplier. This dynamic, according to Orangeburg, empowers NCUC to act as the gatekeeper for reliable and low-cost wholesale power from North Carolina-based utilities, where the state commission leverages the knock-on effects of its retail accounting decisions to control which wholesale customers enjoy the benefits of native-load status.

In July 2009, Orangeburg filed a petition with FERC, requesting that the Commission find that the 2009 NCUC Declaratory Ruling "does not apply to [Orangeburg] . . . by reason of federal preemption . . . ." *City of Orangeburg, S.C.*, 151 FERC ¶ 61,241, at 62,596 (2015), J.A. 223. In short,

Orangeburg argued that the "2009 NCUC [Declaratory Ruling] intrudes upon [FERC]'s exclusive jurisdiction over wholesale rates pursuant to the [Federal Power Act]." *Id.* at 62,597, J.A. 225. Orangeburg's petition languished for six years. Eventually, in 2015, FERC dismissed the petition without addressing the merits, holding that because "Orangeburg and Duke voluntarily terminated the Agreement following the 2009 NCUC [Declaratory Ruling]," the petition was moot. *Id.* at 62,601, J.A. 232. FERC, in other words, declined to pass on the legality of NCUC's purported gatekeeping role that, according to Orangeburg, thwarted – and continues to thwart – the city's ability to purchase interstate wholesale power from North Carolina utilities like Duke.

**B.**

The controversy over NCUC's actions did not end there. In 2011, Duke's parent company, Duke Energy Corporation, sought to merge with Progress Energy, Inc. *Duke Energy Corp.*, 136 FERC ¶ 61,245 (2011). As part of that merger, the two parent companies filed with FERC a Joint Dispatch Agreement ("JDA"), which would govern the interstate dispatch of power from the generation systems of their subsidiaries, Duke and Progress Energy Carolinas, Inc. ("Progress").

The JDA incorporated the NCUC regulatory conditions that allegedly thwarted the 2008 Duke-Orangeburg deal. Specifically, Section 3.2(c) provided that Duke and Progress would not: (1) "make or incur a charge" unless in accordance with "orders of the NCUC;" (2) "seek to reflect in its North Carolina retail rates" any cost disallowed by NCUC or "any revenue level . . . other than the amount imputed by the NCUC;" nor (3) "assert in any forum" that NCUC's authority to impute revenue is preempted. *Joint Dispatch Agreement*

*Between Duke Energy Carolinas, LLC and Carolina Power & Light Co.* at 4-5 (hereinafter, "*Joint Dispatch Agreement*"), J.A. 15-16. Importantly, the JDA further embedded the distinction between native-load and non-native-load customers, providing that only the former would be entitled to the most reliable and lowest cost power. *Id.* at 5-6 (Article V), J.A. 16-17; *id.* at 8 (Article VII), J.A. 19; *see also id.* at 2 (Article I, Definitions), J.A. 13.

In June 2012, over Orangeburg's protest, FERC approved the JDA in substantial part. *Duke Energy Corp.*, 139 FERC ¶ 61,193 (2012) (hereinafter, "*JDA Approval Order*"), J.A. 118-35. Two grounds for the city's protest are relevant here. First, Orangeburg argued that Section 3.2(c) of the JDA, which effectively incorporated the NCUC regulatory regime, "will result in [NCUC]'s usurpation of [FERC]'s exclusive jurisdiction over wholesale sales." *Id.* at 62,324, J.A. 126-27. In its JDA Approval Order, FERC directed the applicants to remove the problematic provisions of Section 3.2(c) because they "pertain[ed] fundamentally to retail ratemaking," but the Commission continued to "offer no view on [NCUC]'s authority to impose or apply such requirements in its proceedings." *Id.* at 62,325, J.A. 130. In other words, when faced squarely with Orangeburg's continuing complaints regarding NCUC's regulatory regime, FERC again declined to weigh in.

Second, Orangeburg argued that the JDA would "arbitrarily divide Duke's and [Progress]'s wholesale sales into native load and non-native load categories and permit [NCUC] to decide which wholesale customers fall into each category," thereby enabling Duke, Progress, and NCUC "to unduly discriminate against wholesale customers." *Id.* at 62,326, J.A. 131. FERC rejected that argument as well, relying solely on its past decision, Order No. 2000. *Id.* at

62,327 (citing *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (hereinafter, "Order No. 2000")), J.A. 133-34. In three sentences, the Commission summarily explained that Order No. 2000 affirms a state agency's authority to require utilities, like Duke and Progress, to accord preferential treatment to native-load wholesale customers. Accordingly, the Commission approved "[t]he JDA's allocation of lowest cost power to the native load customers of [Duke] and [Progress] . . . ." *Id.*, J.A. 134.[1]

Orangeburg then filed a request for rehearing, which FERC denied. *Duke Energy Corp.*, 151 FERC ¶ 61,242 (2015) (hereinafter, "*Rehearing Order*"), J.A. 179-187. Orangeburg now petitions for review of both the JDA Approval Order and the Rehearing Order.

## II.

At the outset, FERC interposes a threshold objection to Orangeburg's petition, arguing that Orangeburg lacks Article III standing.

Article III standing is both a constitutional and statutory requirement for reviewing the instant petition. As a constitutional matter, we must assure ourselves that this is the type of dispute susceptible of judicial resolution and appropriate for the exercise of judicial power. *Lujan v.*

---

[1] FERC did, however, take issue with the JDA's distinction between "*existing* non-native-load customers over *new* non-native load customers[,]" and conditionally approved the JDA, subject to the removal of that distinction. *Id.*, J.A. 134.

*Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992). As a statutory matter, the Federal Power Act affords judicial review only to those parties "aggrieved" by an order issued by FERC, 16 U.S.C. § 825*l*(b), and a party is "aggrieved" only if it has Article III standing. *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998). To satisfy these twin demands, Orangeburg "must show an actual or imminent injury in fact, fairly traceable to the challenged agency action, that will likely be redressed by a favorable decision." *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). We will address the three elements of Article III standing – injury, causation, and redressability – in turn.

**A.**

Orangeburg suffered an injury-in-fact because it cannot purchase wholesale power on its desired terms. "This Court has permitted consumers of a product to challenge agency action that prevented the consumers from purchasing a desired product." *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012); *see, e.g.*, *Chamber of Comm. v. SEC*, 412 F.3d 133, 136-38 (D.C. Cir. 2005) (lost opportunity to purchase shares in mutual funds with fewer than 75% independent directors); *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003) (high-speed internet); *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 112-13 (D.C. Cir. 1990) (larger vehicles); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1332-34 (D.C. Cir. 1986) (more fuel-efficient vehicles).

The lost opportunity to purchase a desired product is a cognizable injury, even though Orangeburg *can* purchase, and *has* purchased, wholesale power from another source. "[T]he inability of consumers to buy a desired product may constitute

injury-in-fact *even if they could ameliorate the injury by purchasing some alternative product*." *Consumer Fed'n of Am.*, 348 F.3d at 1012 (emphasis added) (internal quotation marks omitted). In *Consumer Federation*, for example, we held that even though the plaintiffs "could obtain high-speed internet access" from another source, they nonetheless suffered an injury-in-fact because they could not obtain that access from the internet service provider of their choice. *Id.* Likewise, even though Orangeburg can and does purchase wholesale power from another source, the city cannot purchase wholesale power from the provider of its choice *nor* on its preferred terms – Orangeburg wants to purchase wholesale power from Duke as a *native-load* customer. This matters. Under the terms of the JDA, native-load status means that the customer will receive both the most reliable and lowest cost power. *See Joint Dispatch Agreement* at 5-6 (most reliable), J.A. 16-17; *id.* at 8-10 (lowest cost), J.A. 19-21. Indeed, the harm of the lost opportunity is quantifiable: in 2008, the switch to an agreement treating Orangeburg as a native-load customer was projected to save the city's retail customers approximately $10 million per year. In short, Orangeburg's lost opportunity to purchase wholesale power as a native-load customer – *i.e.*, to purchase the most reliable and lowest cost power – is an injury-in-fact. *See Chamber of Comm.*, 412 F.3d at 138.

An injury must, of course, be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted); *accord Whitemore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A threatened injury must be 'certainly impending' to constitute injury in fact."). FERC observes that Orangeburg's current wholesale power contract does not expire for another five years. This observation is correct, as is the Commission's further observation that Orangeburg has yet to seek out a new contract. But as Commissioner Moeller explained in his dissent to FERC's 2015 dismissal of

Orangeburg's petition, it is impractical to negotiate such complex transactions this far in advance. *City of Orangeburg, S.C.*, 151 FERC at 62,602-03 (Moeller, dissenting), J.A. 240.

Moreover, "[s]tanding depends on the probability of harm, not its temporal proximity." *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006). With the impending expiration of its current agreement in 2022, Orangeburg will need to secure a new bilateral power purchase agreement: because the Southeastern states, including the Carolinas, have not restructured their electric utilities, "virtually all the physical sales in the Southeast are done bilaterally." FERC, *Electric Power Markets: Southeast*, https://www.ferc.gov/market-oversight/mkt-electric/southeast.asp (last updated March 10, 2016). Orangeburg's historical practice has been to solicit proposals for such arrangements two or three years before the expiration of its existing contract; so the city will solicit proposals again in 2019 or 2020. As it did the last time it was on the market for a new power deal, Orangeburg will try to secure the best terms it can.

Under the FERC-approved JDA, Duke and Progress's best terms are reserved for native-load customers. *Joint Dispatch Agreement* at 5-6, J.A. 16-17; *id.* at 8-10, J.A. 19-21. But in 2011, James Rogers, then-CEO of Duke's parent company, testified that Duke's willingness to grant native-load status to a new customer, like Orangeburg, is a function of whether NCUC recognizes that status. *Pub. Serv. Comm'n of S.C. Testimony Tr.* at 57:10-12, J.A. 114. In turn, NCUC has declared that in future proceedings, the state commission would not treat Orangeburg as a native-load customer. *2009 NCUC Declaratory Ruling*, 2009 WL 904943, J.A. 207. Therefore, in 2019 or 2020, Orangeburg will again lose the opportunity to purchase wholesale power from Duke as a native-load customer, absent some intervening event.

But the prospect of such an event is not at all promising for Orangeburg. The last time around, after Orangeburg timely initiated efforts to obtain a new contract with Duke, FERC sat on Orangeburg's past petition for declaratory relief for *six* years before dismissing the petition without addressing the merits, allowing time to moot the city's claim. *City of Orangeburg, S.C.*, 151 FERC at 62,596, J.A. 223. Such exceptional delay and foot-dragging by the Commission in a time-sensitive matter has to be factored in to the analysis of the imminence of Orangeburg's injury. If the city waits for relief until it starts contract negotiations in 2019, there is a substantial risk that it will again be too late to obtain timely review from FERC. We therefore cannot look solely to the ordinary process of contract negotiation in this case; the injury is more pressing because the contracting process has to start early enough to permit timely FERC review. In effect, what Orangeburg seeks to do here is reverse the order of the two steps of its contracting process – obtaining the legal authority to contract from FERC *before* expending extensive time and resources to secure a new power purchase agreement. In addition, the need for review of the Commission's decision is pressing now because, until the status of the JDA and its approval of the NCUC non-native load rules is straightened out by FERC, North Carolina utilities will very likely be unwilling to even begin the negotiation process with the city, knowing that the process will not end in an economically viable deal. Consequently, this is an unusual case where FERC's exceptional delay has necessitated resolving these legal issues as the first step of facilitating the forthcoming contracting process in the manner that Orangeburg alleges the law requires. That makes the injury and need for the Commission's decision sufficiently imminent for Article III purposes.

Orangeburg will seek a new agreement in the next few years, and when it does, the city will relive its experience from

2008, when the Duke-Orangeburg deal was undone. The FERC-approved JDA reserves the most reliable and lowest cost power to native-load customers, Duke looks to NCUC to determine who will be treated as such a customer, and NCUC has declared that Orangeburg will not be. Against the unusual backdrop of long delay and continued inaction on FERC's part, we conclude that Orangeburg has demonstrated an "imminent" or "certainly impending" risk of losing out on the opportunity to purchase its desired product – the most reliable and lowest cost power from Duke.

**B.**

Turning to the causation element of standing, Orangeburg's lost "opportunity to purchase a desired product" is caused by, or fairly traceable to, FERC's approval of the JDA. "Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (citations omitted).

FERC contends that the causation element is not satisfied because Orangeburg's injury is actually caused by NCUC, an absent third party, not the Commission. To be sure, NCUC – a non-party – is a key player in the causal story. But the existence of, perhaps, an equally important player in the story does not erase FERC's role. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (rejecting the proposition that causation attributable to "the very last step in the chain of causation" negates causation attributable to a "determinative" step earlier in the chain); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1293-95 (D.C. Cir. 2007) (holding that two agencies "caused" an Article III injury by providing $5.5 million to fund an $80 million infrastructure project, where the

project was principally funded and managed by numerous non-parties); *see also* 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3531.5, at 311-15 (3d ed. 2008) ("It may be enough that the defendant's conduct is one among multiple causes.").

In fact, "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc). According to Orangeburg, when FERC approved the JDA, it expressly authorized Duke's preferential treatment of native-load customers, and implicitly authorized NCUC's role as the gatekeeper for that preferential treatment. Together, this FERC-approved conduct, according to Orangeburg, will prevent the city from purchasing Duke's most reliable and lowest cost power. This theory of causation rests on two premises: (1) FERC's approval of the JDA "authorized" the conduct that will prevent Orangeburg from purchasing Duke's most reliable and lowest cost power, and (2) "that conduct would allegedly be illegal otherwise." *Id.*

With respect to the first premise, FERC's approval of the JDA constitutes "authorization" of the cause of Orangeburg's injury in two interlocking ways: FERC approved the JDA's preferential treatment of native-load customers, and declined to preempt NCUC's alleged gatekeeping regime. *First*, the cause of Orangeburg's injury begins with the fact that wholesale customers are treated differently based on their native-load status, and FERC expressly approved that disparate treatment. The JDA divides the world into two categories of customer: native load and non-native load. Only native-load customers –

including wholesale customers – enjoy access to the most reliable and lowest cost power. *Joint Dispatch Agreement* at 5-6, J.A. 16-17; *id.* at 8-10, J.A. 19-21. Orangeburg wants to purchase wholesale power on those favorable terms, but cannot because Duke will not treat the city as a native-load customer as long as NCUC disapproves. *Pub. Serv. Comm'n of S.C. Testimony Tr.* at 57:10-12 (Duke Parent CEO Testimony), J.A. 114. If the JDA did not provide for the disparate treatment of native-load and non-native-load customers, Orangeburg's problems would be reduced; wholesale customers, native load or not, would enjoy equal access to Duke's most reliable and lowest cost power. But the JDA does feature such a distinction and, critically, FERC approved it. *JDA Approval Order*, 139 FERC at 62,327, J.A. 133-34. And the Commission did not have to: for example, it could have disapproved those provisions as unjust, unreasonable, unduly discriminatory, or preferential, 16 U.S.C. §§ 824d(b), 824e(a), as it did for other provisions of the JDA regarding native-load status, *JDA Approval Order*, 139 FERC at 62,327, J.A. 134. By approving the JDA's allocation of the most reliable and lowest cost power to native-load customers, FERC "authorize[d] the conduct that allegedly caused" Orangeburg's loss of an opportunity to purchase the product it desires. *Glickman*, 154 F.3d at 440.

*Second*, FERC declined to preempt NCUC's alleged gatekeeping regime, which was incorporated into the JDA and is allegedly preventing Orangeburg from being treated as a native-load customer. As submitted, the JDA included provisions that incorporated NCUC's regulatory regime: Duke and Progress agreed to follow all NCUC orders, to accept any revenue amount imputed by NCUC, and to refrain from arguing that NCUC's actions are preempted by federal law. *Joint Dispatch Agreement* at 4-5, J.A. 15-16. Orangeburg argued that those provisions would result in NCUC's "usurpation of the Commission's exclusive jurisdiction over

wholesale sales." *JDA Approval Order*, 139 FERC at 62,324, J.A. 127. In response, FERC directed the parties to remove those provisions because they "pertain[ed] fundamentally to retail ratemaking," while continuing to "offer no view on [NCUC]'s authority to impose or apply such requirements in its proceedings." *Id.* at 62,325, J.A. 130. But in a sense, the Commission *was* offering a view on NCUC's authority: contrary to Orangeburg's protest, FERC concluded that the provisions incorporating the state regulatory regime "pertain[ed] fundamentally to *retail* ratemaking." *Id.* (emphasis added). Had FERC found that those provisions and the state regime pertained to *wholesale* ratemaking, the Commission could have, as it concedes, preempted NCUC's regulatory requirements. Resp.'s Br. at 34 (citing *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1156 (D.C. Cir. 1996)). Indeed, Orangeburg implored FERC to do so, as the Commission has in the past. *See, e.g.*, *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047, at 61,337-38 (2010). But FERC did not. Despite the opportunity to squarely settle the matter by either preempting NCUC's regulatory regime or explaining why the regime was in harmony with federal law, FERC attempted to sidestep the issue by ordering the parties to simply omit the troublesome provisions.

FERC's approach to the JDA fits within a pattern of acquiescence. Shortly after the 2008 Duke-Orangeburg deal was frustrated by the 2009 NCUC Declaratory Ruling, Orangeburg filed a petition with FERC requesting that the Commission find that NCUC's ruling was preempted by federal law. *City of Orangeburg, S.C.*, 151 FERC at 62,596, J.A. 223. Even now, FERC insists that this proceeding – and not the JDA proceeding – was the appropriate "vehicle to address Orangeburg's preemption and other challenges to [NCUC]'s 'regulatory conditions.'" Respondent's Br. at 37. Conveniently, FERC glosses over the fact that it sat on

Orangeburg's petition for *six* years, waiting until 2015, when time had mooted the issue, to dismiss the petition without addressing the merits. This repeated acquiescence and refusal to settle the matter contributes to the bigger picture of FERC's authorization of NCUC's conduct.

Apparently, that is how NCUC interprets FERC's behavior too. In 2012, NCUC approved the merger of Duke and Progress's parent companies. *See Order Approving Merger Subject to Regulatory Conditions and Code of Conduct*, Docket Nos. E-2, Sub 998, E-7, Sub 986, 2012 WL 2590482 (N.C. Utils. Comm'n June 29, 2012). In approving the merger, NCUC addressed the same arguments raised by Orangeburg here: "The primary argument underlying Orangeburg's challenges before FERC is that [NCUC] is acting as gatekeeper to [Duke]'s and [Progress]'s wholesale sales and will continue to do so under the proposed regulatory conditions." *Id.* But, NCUC reasoned, these arguments cannot have merit because, "[w]ere Orangeburg correct in its repeatedly made arguments that [NCUC] is intruding upon FERC's exclusive jurisdiction, FERC would be expected to agree with them." *Id.* Since FERC has not ruled on the matter, NCUC interpreted FERC's inaction as a green light to continue implementing its allegedly unlawful regulatory regime.

In short, with respect to the first *Glickman* premise, FERC's approval of the JDA "authorize[d] the conduct that allegedly caused the plaintiff's injuries" in two interlocking ways. *Glickman*, 154 F.3d at 440. First, FERC loaded the gun by affirmatively approving provisions in the JDA that reserve the most reliable and lowest cost power for native-load customers. Second, as part of a pattern of acquiescence, FERC let NCUC grab hold of the gun by declining to preempt the state regulatory regime that was incorporated into the JDA. Together, these two actions "authorized" conduct by Duke,

Progress, and NCUC that allegedly will cause Orangeburg to lose the opportunity to purchase its desired product – the most reliable and lowest cost power.

With respect to the second *Glickman* premise – that the FERC-authorized conduct "would allegedly be illegal" – Orangeburg has demonstrated both that the FERC-approved JDA would allegedly violate the Federal Power Act, and that the NCUC regulatory regime incorporated into the JDA would allegedly violate the Commerce Clause. *First*, as we discuss in greater detail below, it is at least plausible that the FERC-approved JDA's preferential treatment of native-load wholesale customers would be "unduly discriminatory" under the Federal Power Act. *See* 16 U.S.C. § 824e(a). The JDA provides that the most reliable and lowest cost power will be reserved for native-load wholesale customers, and such disparate treatment would be inappropriate without "a valid reason for the disparity." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 239 (D.C. Cir. 2013) (internal quotation marks omitted). According to Orangeburg, there is no "valid reason." Therefore, for the purposes of standing, the JDA's preferential treatment of native-load wholesale customers "would allegedly be illegal" without FERC's approval. *See Glickman*, 154 F.3d at 440.

*Second*, Orangeburg alleges that NCUC, through its imputation of wholesale revenue in retail ratemaking, prevents the sale of low-cost North Carolina power to out-of-state wholesale customers, in an effort to privilege in-state retail customers. These allegations bear some resemblance to *New England Power Co. v. New Hampshire*, in which New Hampshire's utility commission prohibited the out-of-state exportation of hydroelectric power because that power was "required for use within the state" and the prohibition would serve the "public good." 455 U.S. 331, 335-36 (1982). The

Supreme Court explained that the Commerce Clause "precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *Id.* at 338. The New Hampshire commission's order was "precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states." *Id.* at 339. Likewise, according to Orangeburg, NCUC's regulatory requirements are protectionist regulations that violate the Commerce Clause. Therefore, for the purposes of standing, Orangeburg has demonstrated that the NCUC regulatory regime "would allegedly be illegal" without FERC's authorization. *See Glickman*, 154 F.3d at 440; *see also New England Power*, 455 U.S. at 338-39; *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1926) ("Being the imposition of a direct burden upon interstate commerce, from which the state is restrained by the force of the Commerce Clause, it must necessarily fall, regardless of its purpose.").

In sum, the causation element of standing is satisfied because Orangeburg has "demonstrate[d] that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries," and "that conduct would allegedly be illegal otherwise." *Glickman*, 154 F.3d at 440. Orangeburg's injury – the loss of the opportunity to purchase Duke's most reliable and lowest cost power – is "allegedly caused" by the JDA's preferential treatment of native-load customers and NCUC's control over which customers enjoy native-load status. FERC "authorized" that conduct by approving JDA provisions that accorded preferential treatment for native-load customers, and by declining to preempt the JDA-incorporated regulatory regime that allegedly empowered NCUC to exercise control over which wholesale customers enjoy native-load status. Without FERC's authorization, that conduct "would allegedly be illegal" because the preferential treatment of

native-load customers might be "unduly discriminatory" under the Federal Power Act and NCUC's control over native-load status might violate the Commerce Clause. Therefore, we conclude that Orangeburg has satisfied the causation element of Article III standing.

## C.

Finally, we turn to the redressability element of Article III standing, which Orangeburg has also satisfied. FERC does not mount a redressability attack on Orangeburg's standing, but this Court must nonetheless assure itself that all of the conditions of standing obtain. *See Steel Co. v. Citizens for a Better Envmt.*, 523 U.S. 83 (1998).

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 663-64 (footnote omitted). There may be multiple ways in which a favorable decision is likely to redress Orangeburg's injury, but at least one is certain and undisputed: this Court could – itself – conclude that the JDA enacts a regime in which NCUC is empowered to act as a gatekeeper for interstate wholesale power transactions, in violation of the Federal Power Act or the Commerce Clause. *See, e.g.*, *Nantahala Power and Light Co. v. Utils. Comm'n of N.C.*, 476 U.S. 953, 967-73 (1986) (holding that NCUC's failure to honor FERC-filed rates for the purposes of retail ratemaking caused trapped costs and was preempted by the Federal Power Act); *Attleboro*, 273 U.S. at 89 (invalidating a Rhode Island regulation as a "direct burden upon interstate commerce"). We could then vacate the order. Such a determination would diminish the obstacles preventing Orangeburg from accessing the most reliable and lowest cost power from Duke. Faced with such a decision from a federal

court, NCUC is unlikely to maintain its policy of setting retail rates for out-of-state entities so as to create trapped costs. *Cf. Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 6-7 (D.C. Cir. 2005). Therefore, if we were to "choose[] to grant" the relief sought, such relief would "likely alleviate" Orangeburg's injury. *See Fla. Audubon Soc'y*, 94 F.3d at 663-64.

We pause to emphasize the unique and unusual posture of the instant petition. Orangeburg has persistently implored FERC to settle the question of whether NCUC's actions are lawful. FERC has persistently avoided the issue. Most notably, the Commission channeled all NCUC-related objections to a declaratory order proceeding, which it then delayed for six years before dismissing the underlying petition as moot. Aside from the unfairness of exiling Orangeburg to legal limbo, this context affects the standing analysis: Orangeburg's injury is made more imminent by the unlikelihood that FERC will intervene and ameliorate the harm; and, as to causation, FERC's repeated acquiescence to the NCUC regime bolsters the case that the Commission "authorized" the conduct that is allegedly causing Orangeburg's injury. Against this unusual backdrop, we conclude that Orangeburg has "show[n] an . . . imminent injury in fact, fairly traceable to the challenged agency action, that will likely be redressed by a favorable decision." *Exxon Mobil Corp.*, 571 F.3d at 1219.

## III.

We turn now to the merits of the petition. In its protest of the JDA, Orangeburg advanced the arguments we discussed above. In short, Orangeburg argued:

> The executed JDA, in conjunction with [the] new State Regulatory Conditions filed at the NCUC, will allow the NCUC to use its retail ratemaking authority

to effect a multistate geographic market allocation of Duke's and Progress's average system cost power. NCUC-favored wholesale customers will be able to purchase and obtain an economic and long-term supply of power from Duke or Progress; NCUC-disfavored wholesale customers will not. Such a result is contrary to the free flow of goods in interstate commerce, the purpose of the Federal Power Act ("FPA") and FERC's policy of increased competitive wholesale markets.

*Motion to Intervene and Protest of the City of Orangeburg, South Carolina*, at 6 (June 16, 2012) (footnote omitted), J.A. 37.

If FERC finds that a "rule, regulation, practice, or contract affecting [a FERC-jurisdictional] rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate . . . and shall fix the same by order." 16 U.S.C. § 824e(a); *accord Elec. Power Supply Ass'n*, 136 S. Ct. at 767. "We accept disparate treatment between ratepayers only if FERC offers a valid reason for the disparity." *Black Oak Energy*, 725 F.3d at 239 (alterations and internal quotation marks omitted). Unless FERC offers such a valid reason, its decision to approve disparate treatment of wholesale ratepayers is "arbitrary and capricious." *See id.* at 237; *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1984) (holding that in order to survive review under the "arbitrary and capricious" standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks omitted)).

At issue here, FERC approved provisions of the JDA that established disparate treatment between native-load and non-native-load wholesale customers. According to Orangeburg, these JDA provisions operate against the backdrop of NCUC's functional veto over which wholesale customers fit into the former category. Therefore, in order to survive review, FERC must have "offer[ed] a valid reason for the disparity" between native-load and non-native-load wholesale customers under these circumstances. *Black Oak Energy*, 725 F.3d at 239 (internal quotation marks omitted).

FERC's response to Orangeburg's protest was brief enough to quote here in full. The Commission explained:

> We find that the allocation of the lowest cost energy under the JDA to the native load customers of [Duke] and [Progress] is not unduly discriminatory. In Order No. 2000, the Commission acknowledged that in areas without retail choice, state commissions have the authority to "require a utility to sell its lowest cost power to native load, as they always have." The JDA's allocation of lowest cost power to the native load customers of [Duke] and [Progress] is consistent with this finding.

*JDA Approval Order*, 139 FERC at 62,327 (alterations and footnote omitted) (quoting Order No. 2000), J.A. 133-34. In short, the extent of FERC's response to Orangeburg's overlapping Federal Power Act, preemption, and Commerce Clause arguments was to refer to Order No. 2000; all the heavy lifting is done implicitly by the Commission's interpretation of the Order. FERC's order denying rehearing was no better. *See generally Rehearing Order*, 151 FERC ¶ 61,242, J.A. 179-187.

Although we accord "substantial deference" to the Commission's interpretation of its own orders, *Consumers*

*Energy Co. v. FERC*, 428 F.3d 1065, 1067-68 (D.C. Cir. 2005), FERC's exclusive reliance on Order No. 2000 is untenable. On its face, the Order does not supply a reason for the JDA's disparate treatment of native-load and non-native-load interstate wholesale customers, especially in light of NCUC's alleged control over which customers enjoy native-load status.

Order No. 2000 was a rule designed to promote regional transmission organizations.[2] *Pub. Util. Dist. No. 1*, 272 F.3d at 609. "In response to the concern of low cost states that [regional transmission organizations] could result in exports of their low cost power to other states," the Commission explained, "[w]here there is no retail choice, our Final Rule does not affect a state commission's authority to require a utility to sell its lowest cost power to native load, as it always has." Order No. 2000, 89 FERC ¶ 61,285, at \*254.

This brief passage cannot, without more explanation, be extended to justify disparate treatment of *interstate wholesale* ratepayers. *First*, the passage is conditioned on the absence of "retail choice," which indicates that the recognition of a state commission's authority pertains to disparities in retail, not wholesale, rates. The cited passage from Order No. 2000 appears to stand for the proposition that, for example, NCUC may require Duke to sell its lowest cost power to *retail* native-load customers in North Carolina. But that proposition is uncontested: Orangeburg protests NCUC's control over *wholesale* native-load customers, not the state commission's imposition of requirements for *retail* native-load customers.

---

[2] "Generally, [regional transmission organizations] are voluntary associations of transmission facilities that administer energy markets and file tariffs for a group of utilities under section 205 [of the Federal Power Act]." *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 349 (D.C. Cir. 2014).

*Second*, FERC's proffered interpretation of Order No. 2000 would be in tension with another order:  Order No. 888. *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996) (hereinafter, "Order No. 888").  Importantly, Order No. 888 served as the foundation for Order No. 2000.  *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 681 (D.C. Cir. 2000) (per curiam).  Prior to Order No. 888, some wholesale customers were stuck with a single utility capable of serving them, which "produced an implicit obligation by the utilities to continue satisfying their customers' power needs, as well as a reciprocal expectation by customers of continued service."  *Id.* at 699-700.  In other words, the utility serving wholesale customers without a choice of suppliers was under a regulatory obligation to treat those customers as "native load." *See* 18 C.F.R. § 33.3(d)(4)(i) (defining "native load commitments" as including "commitments to serve wholesale . . . power customers on whose behalf the potential supplier, by . . . regulatory requirement . . . has undertaken an obligation to construct and operate its system to meet their reliable electricity needs").  But in Order No. 888, the Commission upended that regime, announcing that it was "not appropriate" to impose on a utility a "regulatory obligation" to treat a wholesale customer as part of the utility's native load.  Order No. 888, 61 Fed. Reg. at 21,638 ("[I]t is not appropriate to impose on a wholesale requirements supplier a regulatory obligation to continue to serve its existing requirements customer beyond the end of the contract term."); *see also Transmission Access Policy Study Grp.*, 225 F.3d at 700 ("Order 888 fundamentally undermines utilities' expectation of continued service and cost recovery.").

FERC's interpretation of Order No. 2000 here is in tension with that ruling.  Although Order No. 888 bars "regulatory

obligations" requiring utilities to treat wholesale customers as native load, the Commission's interpretation of Order No. 2000 authorizes NCUC to require Duke to serve the "lowest cost power" to native-load wholesale customers. The two orders are not necessarily irreconcilable, but the tension requires further explication from FERC.

*Third*, FERC's interpretation of Order No. 2000 suggests that NCUC has the authority to regulate *interstate wholesale* power sales, but that would plainly intrude upon FERC's exclusive jurisdiction. *See New England Power*, 455 U.S. at 340. The record contains at least one example of disparate treatment involving *interstate* sales of wholesale power: North Carolina-based Duke agreed to treat Greenwood, South Carolina as a native-load customer, and NCUC approved. According to FERC's reasoning, the fact that Order No. 2000 authorizes NCUC, a state commission, to "require a utility to sell its lowest cost power to native load" justifies the disparate treatment by North Carolina-based Duke of two South Carolina wholesale ratepayers, Greenwood and Orangeburg. *See JDA Approval Order*, 139 FERC at 62,327 (internal quotation marks omitted), J.A. 133-34. But FERC – not state commissions – has "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *New England Power*, 455 U.S. at 340; *see also Elec. Power Supply Ass'n*, 136 S. Ct. at 766 (holding that FERC has jurisdiction over "rules or practices that directly affect the wholesale rate" (emphasis, internal quotation marks, and alterations omitted)). Therefore, insofar as the Commission attempts to justify disparate treatment of interstate wholesale customers by invoking a state commission's authority, FERC's interpretation of Order No. 2000 is unsound.

In sum, it is not clear how FERC can stretch the cited passage from Order No. 2000 to cover disparate treatment of

interstate wholesale ratepayers, like Greenwood and Orangeburg. That is not to say there is no possible explanation for FERC's approval of the JDA. But the Commission brandishes Order No. 2000 as though it speaks for itself, plainly and self-evidently justifying the JDA's disparate treatment of wholesale ratepayers. For the reasons explained above, such an unadorned explanation does not suffice. Without more, the Commission's approval of the JDA's challenged provisions were either legally unsound or unresponsive. Because "FERC [has not] offer[ed] a valid reason for the disparity," we cannot affirm its approval of the JDA provisions that establish disparate treatment of native-load and non-native-load wholesale customers, and incorporates NCUC's potentially unlawful regulatory regime. *See Black Oak Energy*, 725 F.3d at 239. Therefore, we conclude that FERC acted arbitrarily and capriciously by failing to "articulate a satisfactory explanation for its action." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. We grant the petition for review and vacate the portions of the JDA Approval Order and Rehearing Order that accept disparate rates for native-load and non-native-load wholesale customers.

\*\*\*

For the foregoing reasons, we vacate in part the JDA Approval Order and the Rehearing Order, and remand the matter to FERC for further explanation regarding its approval of the JDA.

*So ordered.*