# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 12, 2017               Decided July 7, 2017

No. 15-1452

NRG POWER MARKETING, LLC, AND GENON ENERGY
MANAGEMENT, LLC,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PSEG ENERGY RESOURCES & TRADE LLC, ET AL.,
INTERVENORS

———

Consolidated with 15-1454

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*John Lee Shepherd, Jr.* argued the cause for petitioners. With him on the briefs were *John N. Estes III*, *Paul F. Wight*, *Jeffrey A. Lamken*, *Abraham Silverman*, and *Cortney Madea*.

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*Paul M. Flynn* argued the cause for intervenors. With him on the brief were *Ryan J. Collins*, *Jennifer H. Tribulski*, *Gary J. Newell*, *Larry F. Eisenstat*, *Richard Lehfeldt*, *Delia D. Patterson*, *Randolph Elliott*, *Paul M. Breakman*, *Scott H. Strauss*, *Jeffrey A. Schwarz*, *Stefanie Brand*, *Stuart A. Caplan*, *Richard M. Zuckerman*, *Christopher S. Porrino*, Attorney General, Office of the Attorney General for the State of New Jersey, *Carolyn McIntosh*, Deputy Attorney General, *Robert A. Weishaar, Jr.*, and *Adrienne E. Clair*. *Dennis Lane* entered an appearance.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Regional Transmission Organizations are non-profit entities that oversee the transmission of electricity from generators to utilities. Under Section 205 of the Federal Power Act and FERC's regulations, Regional Transmission Organizations file their proposed rate schemes with FERC. 16 U.S.C. § 824d(c); 18 C.F.R. § 35.34(j)(1)(iii). Section 205 allows FERC to suggest "minor" modifications to a proposal made by a Regional Transmission Organization. *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1579 (D.C. Cir. 1993). Here, we must determine whether Section 205 allows FERC to suggest modifications that are more than "minor" and, if not, whether FERC violated that limitation on its authority.

PJM Interconnection is a Regional Transmission Organization. In this case, acting under Section 205, PJM filed with FERC a package of proposed changes to PJM's rate structure. But FERC did not accept PJM's proposal because FERC concluded that the proposal as it stood was not just and

reasonable. *See* 16 U.S.C. § 824d(a). FERC then suggested modifications to the proposal that would, in FERC's view, make the proposal just and reasonable. FERC's modifications created a new rate scheme that was significantly different from PJM's proposal and from PJM's prior rate design. PJM nonetheless accepted FERC's modifications.

Several electricity generators – NRG Power Marketing, GenOn Energy Management, and PJM Power Providers – have petitioned for review of FERC's decision. They argue that FERC's proposed modifications exceeded the agency's authority under Section 205 of the Federal Power Act.

We agree. Section 205 does not allow FERC to make modifications to a proposal that transform the proposal into an entirely new rate of FERC's own making. Here, FERC contravened that limitation on its Section 205 authority. We therefore grant the petitions for review and vacate FERC's Orders with respect to several aspects of PJM's proposed rate structure – the self-supply exemption, the competitive entry exemption, unit-specific review, and the mitigation period. We remand the matter to FERC.

I

A

There are three key players in modern wholesale electricity markets: (i) the electricity generators that produce electricity; (ii) the companies and utilities, known as Load Serving Entities, that deliver electricity to retail customers; and (iii) the non-profit organizations, known as Regional Transmission Organizations, that manage the transmission of electricity from generators to Load Serving Entities. In modern wholesale electricity markets, generators sell electricity, and

Load Serving Entities buy that electricity. Regional Transmission Organizations often set the rates that generators charge and that Load Serving Entities pay.

There are seven Regional Transmission Organizations across the country. The largest of the seven is PJM Interconnection. PJM administers the power grid in parts of 13 Mid-Atlantic and Midwestern states and the District of Columbia.

PJM helps set the price of wholesale electricity by conducting competitive auctions. As relevant here, PJM runs "capacity auctions" to set the price of wholesale electricity three years into the future. The goal of the capacity auctions is to ensure an adequate long-term supply of electricity.

Here is how PJM's capacity auctions work: PJM estimates the demand for electricity three years into the future, and electricity generators estimate their capacity for producing electricity three years into the future. Generators then make bids to sell their future capacity to PJM. Starting with the lowest bid, PJM accepts bids until it has purchased enough capacity to meet its estimate of future demand. The highest accepted bid sets the "clearing price" in the capacity market. The clearing price is the price that generators receive from PJM when their bids are accepted by PJM. Generators are paid the clearing price regardless of the rates listed in their initial bids. The clearing price is also the price that Load Serving Entities must pay in order to purchase electricity from PJM.

For example, imagine that four electricity generators each bid to sell 10 units of capacity to PJM. The four generators respectively bid at $100 per unit, $110 per unit, $120 per unit, and $130 per unit. If PJM projects that it will need 25 units of electricity three years from now, it will purchase 10 units of

capacity at $100 per unit, 10 units at $110 per unit, and 5 units at $120 per unit. The "clearing price" in the market is set by the highest accepted bid – $120 per unit. The three electricity generators that had their bids accepted in the auction will all receive $120 per unit from PJM. Load Serving Entities will pay PJM $120 per unit to purchase electricity.

The clearing price plays an important role in ensuring that there will be an adequate supply of electricity in the future. When the clearing price is high, new generators have an incentive to enter the market because they will be paid more to generate electricity. As a result, the supply of electricity will increase in the long run. However, when the clearing price is low, new generators are less likely to enter the market. That is because the clearing price may not fully cover the cost of generating electricity. For that same reason, a low clearing price also may cause existing high-cost generators to shut down. That means that the supply of electricity will decrease in the long run. *See Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1293, slip op. at 4 (2016).

As FERC has explained, if every generator's bid reflected the actual cost of generating electricity, the capacity auction would be expected to set the clearing price at the appropriate level to encourage the entry of new generators into the market. *See PJM Interconnection, L.L.C.*, 137 FERC ¶ 61,145, at ¶ 25 (2011). The problem is that some generators have incentives to bid below the actual cost of generating electricity. For example, generators that receive state subsidies do not bear the entire cost of generation. As a result, they may bid into the capacity auction at a rate that reflects only a portion of the actual cost of generating electricity. In other words, the generator is able to make a below-cost bid. That below-cost bid may lower the clearing price in the capacity auction. As noted above, a lower clearing price may reduce the supply of

electricity in the long run. To put the problem in more concrete terms: Over the long run, below-cost bidding in capacity auctions could lead to brownouts or blackouts during periods of peak demand.

Recognizing the harms of below-cost bidding, PJM has established what it calls the Minimum Offer Price Rule. The Rule requires new generators to bid at or above a certain price floor set by PJM. The Rule is designed to prevent new market entrants from artificially depressing the clearing price in capacity auctions.

Before 2012, the Minimum Offer Price Rule had two key features that are relevant here.

*First*, not every new market entrant was subject to the Minimum Offer Price Rule. Before 2012, PJM had a "unit-specific review" exemption from the Rule. If a new generator could demonstrate to PJM that its actual costs were below the price floor set by PJM, the generator would be permitted to bid below the price floor.

*Second*, the Minimum Offer Price Rule was time-limited in its application. For new generators subject to the Rule, the Rule applied only until the generator had its bid accepted by PJM at the price floor for one year. After that one-year "mitigation period," the generator would be permitted to bid into subsequent auctions below the price floor.

B

In July 2012, an ad hoc group of generators and Load Serving Entities that participate in PJM's capacity market began to explore possible changes to the Minimum Offer Price Rule. The participants in that ad hoc group were unsatisfied

with the existing unit-specific review exemption. Many believed that unit-specific review lacked transparency and had allowed new market entrants to submit below-cost bids that had depressed clearing prices in PJM's capacity auctions.

After several months of negotiations, the ad hoc group reached agreement on a proposal to reform the Minimum Offer Price Rule. PJM put the proposal to a vote by the entire body of PJM's stakeholders. The proposal received overwhelming support from PJM's stakeholders. According to PJM, the proposal represented the first time in PJM's history as a Regional Transmission Organization (which goes back to 2001) that a significant revision to the Minimum Offer Price Rule had received the endorsement of more than two-thirds of PJM's stakeholders.

As relevant here, the proposal had two key components.[1]

*First*, the proposal sought to eliminate the unit-specific review exemption from the Minimum Offer Price Rule and replace it with two categorical exemptions from the Rule: a "competitive entry exemption" and a "self-supply exemption." Generally speaking, the competitive entry exemption would apply to generators that are unsubsidized or that are subsidized through a non-discriminatory, state-sponsored procurement process. The self-supply exemption would apply to certain Load Serving Entities that meet a portion of their electricity needs by generating their own electricity. Based on economic projections, PJM asserted that generators that qualify for the competitive entry exemption or the self-supply exemption

---

[1] PJM's proposal also included a number of other changes to the Minimum Offer Price Rule – for example, changes to the resources subject to the Rule, the price floor level, and the geographic scope of the Rule – that were approved by FERC. FERC's decision with respect to those changes is not challenged here.

would be unlikely to depress the clearing prices in capacity auctions and therefore should not be subject to the Minimum Offer Price Rule's price floor. Generators that qualify for either exemption would be permitted to bid into capacity auctions below the price floor.

Replacing the unit-specific review exemption with the two categorical exemptions was a compromise between generators and Load Serving Entities. Generators opposed unit-specific review because they believed that the discretionary nature of unit-specific review had allowed some state-subsidized resources to enter capacity auctions with below-cost bids that would depress the clearing price in capacity auctions. Meanwhile, many Load Serving Entities that generate some electricity on their own favored the two new exemptions because those exemptions would provide more certainty about which generators would be subject to the price floor. According to PJM, the resulting compromise would ensure that generators that "present a high risk of price suppression" would not receive exemptions. Letter from Paul M. Flynn et al., PJM Interconnection, L.L.C., to Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission 25 (Dec. 7, 2012), J.A. 52. The compromise would also substitute "clarity and transparency" for the "non-transparent, discretionary decisions" made under the prior approach. *Id.* at 15, J.A. 42.

*Second*, PJM's proposal sought to extend the "mitigation period" – that is, the period during which the Minimum Offer Price Rule's price floor applies – from one year to three years. Under the proposal, each new generator that is not otherwise exempt from the price floor would have to clear the capacity auction at the price floor for three years before it could bid below the price floor. Extending the mitigation period was part of the compromise regarding unit-specific review and the two new exemptions. In light of the proposed substitution of two

new exemptions for unit-specific review, PJM asserted that the price floor would "be much more targeted at the resources that are most likely to present legitimate price suppression concerns." *Id.* at 16, J.A. 43. Because the price floor would apply to the new generators that pose the highest risk of depressing clearing prices, PJM's stakeholders wanted the price floor to "apply for a longer period." *Id.* at 29, J.A. 56.

In December 2012, PJM filed the proposal with FERC. Although PJM's proposal had multiple components, PJM asked the Commission "to view this filing not as a list of discrete Tariff changes, but as a hard-fought compromise package, and to approve it as such." *Id.* at 15, J.A. 42.

PJM filed the proposal pursuant to Section 205 of the Federal Power Act. Section 205 requires utilities to file proposed rate changes with FERC. 16 U.S.C. § 824d(c). Under FERC's regulations, although Regional Transmission Organizations such as PJM are not utilities, Regional Transmission Organizations file proposed rate changes with FERC in accordance with the procedures ordinarily followed by utilities under Section 205. *See* 18 C.F.R. § 35.34(j)(1)(iii). FERC must accept proposed rate changes filed under Section 205 so long as the changes are just and reasonable. 16 U.S.C. § 824d(a).

In May 2013, FERC concluded that parts of PJM's proposal were not just and reasonable. *PJM Interconnection, L.L.C.*, 143 FERC ¶ 61,090, at ¶ 26 (2013). As relevant here, FERC asserted that the proposal would unreasonably narrow the exemptions from the Minimum Offer Price Rule's price floor. According to FERC, some generators that may be able to demonstrate that their costs fall below the price floor – that is, some generators that would have been exempt under unit-specific review – would no longer qualify for an exemption

from the price floor. *Id.* ¶ 141. FERC also asserted that the proposed three-year mitigation period would subject generators to the price floor for too long, thereby discouraging the entry of new generators into the wholesale electricity market. *Id.* ¶ 211.

At the same time, FERC proposed several modifications to PJM's filing that would, in FERC's view, make PJM's filing just and reasonable. As relevant here, FERC stated that it would accept the proposed competitive entry and self-supply exemptions, but only on the condition that PJM retain the unit-specific review process. *Id.* ¶¶ 141-143. FERC also stated that it would not allow PJM to extend the mitigation period to three years. *Id.* ¶ 210.

PJM agreed to FERC's proposed modifications. As a result, PJM now uses unit-specific review, the competitive entry exemption, the self-supply exemption, and the one-year mitigation period for new generators.

Several electricity generators disagreed with FERC's decision. They requested rehearing. In October 2015, FERC denied the request for rehearing.

A number of generators – NRG Power Marketing, GenOn Energy Management, and PJM Power Providers – then filed petitions for review of FERC's May 2013 and October 2015 Orders. Among other things, they argue that FERC violated Section 205 of the Federal Power Act by making a new rate instead of accepting or rejecting PJM's proposal as it stood. We now turn to that argument.

II

In this case, FERC determined that the new rate scheme proposed by PJM was not just and reasonable under Section 205 of the Federal Power Act. *PJM Interconnection, L.L.C.*, 143 FERC ¶ 61,090, at ¶ 26 (2013); *see* 16 U.S.C. § 824d(a). FERC then suggested a number of modifications to PJM's proposal that would, in FERC's view, make PJM's proposal just and reasonable. *PJM Interconnection, L.L.C.*, 143 FERC at ¶¶ 141-143. The question in this case is whether FERC exceeded its authority under Section 205 when it suggested those modifications to PJM's proposal. The answer is yes.

Section 205 puts FERC in a "passive and reactive role." *Advanced Energy Management Alliance v. FERC*, No. 16-1234, at 10 (D.C. Cir. June 20, 2017) (internal quotation mark omitted). Under Section 205, FERC reviews the proposed rate scheme filed by a utility or Regional Transmission Organization and determines whether the proposal is just and reasonable. *See* 16 U.S.C. § 824d(a); 18 C.F.R. § 35.34(j)(1)(iii). FERC may accept or reject the proposal. But as this Court has held, Section 205 does not authorize FERC to impose a new rate scheme of its own making without the consent of the utility or Regional Transmission Organization that made the original proposal. *See Atlantic City Electric Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002).[2]

---

[2] FERC may unilaterally impose a new rate scheme on a utility or Regional Transmission Organization only under a different provision of the Act: Section 206. 16 U.S.C. § 824e(a). Section 206 requires FERC to demonstrate that the *existing* rates are "entirely outside the zone of reasonableness" before FERC imposes a new rate without the consent of the utility or Regional Transmission Organization that filed the proposal. *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984). All parties agree that FERC did not rely on Section 206 as the basis for its decision in this case.

Although FERC may not *unilaterally* impose a new rate scheme under Section 205, this Court has held that FERC has some authority to propose modifications to a utility's proposal *if the utility consents to the modifications*. In *City of Winnfield v. FERC*, this Court – speaking through Judge Scalia – concluded that FERC does not violate Section 205 when it suggests "a system of rates similar to that previously in effect, and the utility acquiesces." 744 F.2d 871, 876 (D.C. Cir. 1984). In those circumstances, we noted that it would be "empty formalism" to require the utility to make a new filing in order to implement minor changes proposed by FERC. *Id.*

Nonetheless, there are limits on FERC's authority to propose modifications under Section 205 *even when the utility consents to those modifications*. In *City of Winnfield*, we indicated that FERC would violate Section 205 if "the Commission proposal accepted by the utility involved the Commission's own original notion of a new form of rate" or an "entirely new rate scheme." *Id.* at 875, 876. As we noted, "it might be argued" in those circumstances "that the power to initiate change through such rejection-plus-proposal removes the Commission from an essentially passive and reactive role envisioned by § 205." *Id.* at 876. Importantly, we also stated that FERC's proposal of a new rate scheme could deprive the utility's customers of "early notice – in the rate proposal itself – of the sort of rate increase that is sought." *Id.* However, we did not definitively decide whether FERC violates Section 205 when it suggests modifications to the utility's proposal that result in an "entirely new rate scheme." *Id.*

We decisively answered that question nine years later in *Western Resources, Inc. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993). *Western Resources* arose in the context of Section 4 of the Natural Gas Act, which is "identical in substance" to

Section 205 of the Federal Power Act. *City of Winnfield*, 744 F.2d at 875.[3] Our analysis in *Western Resources* turned on the nature of FERC's suggested modifications in that case. We concluded that FERC may not go "beyond approval or rejection" of a proposal to "adoption of an entirely different rate design" than the proposal. *Western Resources*, 9 F.3d at 1578. We explained that FERC may not employ a rate design that follows "a completely different strategy" than, or is "methodologically distinct" from, a proposed rate. *Id.* at 1578, 1579. We also noted that, although "minor deviations" from a proposal are permissible, "the imposition by the Commission of only half of a proposed rate" is not permissible. *Id.* at 1579.

Our decisions in *City of Winnfield* and *Western Resources* indicate that Section 205 does not allow FERC to suggest modifications that result in an "entirely different rate design" than the utility's original proposal or the utility's prior rate scheme. *Western Resources*, 9 F.3d at 1578.

Applying that principle here, we conclude that FERC violated Section 205. FERC's modifications resulted in an "entirely different rate design" than both PJM's proposal and PJM's prior rate scheme. *Id.*

*First*, FERC's proposed modifications resulted in an "entirely different rate design" than PJM's proposal. *Id.* PJM's proposal sought to change how PJM determines which generators are exempt from the Minimum Offer Price Rule's price floor. PJM wanted to replace its case-by-case approach to granting exemptions under unit-specific review with two

---

[3] As in prior cases, we "follow here the familiar practice of applying interchangeably judicial interpretations of provisions from the Natural Gas Act to their substantially identical counterparts in the Federal Power Act." *City of Anaheim v. FERC*, 558 F.3d 521, 523 n.2 (D.C. Cir. 2009) (internal quotation marks omitted).

narrow, categorical exemptions from the price floor. PJM also wanted to apply the price floor to new generators for three years instead of one year. PJM's proposal would have *narrowed* the availability of exemptions to the price floor for some generators that, in the view of some of PJM's stakeholders, posed a high risk of price suppression. But FERC's proposed modifications went in the opposite direction. FERC's modifications *expanded* the exemptions by layering the two new exemptions on top of unit-specific review, and by exempting certain new generators from the price floor after one year instead of after three years. Indeed, FERC's modifications expanded the scope of the exemptions not just beyond PJM's original filing, but beyond the scope of the exemptions as they had stood before PJM's filing. FERC's modifications therefore followed a "completely different strategy" than PJM's proposal. *Id.* at 1579.

*Second*, FERC's modifications also resulted in an "entirely different rate design" than the rate design that was "previously in effect." *Id.* at 1578; *City of Winnfield*, 744 F.2d at 876. Under PJM's prior approach, unit-specific review was the main route to an exemption. As a result, generators had to demonstrate on a case-by-case basis that their costs fell below the price floor. Because of FERC's modifications, some generators can now claim exemptions from the price floor even if they cannot demonstrate that their costs fall below the price floor. In other words, due to FERC's modifications, PJM's previous case-by-case methodology no longer controls.

Ultimately, as in *Western Resources*, FERC in essence approved "only half of a proposed rate." *Western Resources*, 9 F.3d at 1579. FERC's modifications undid the compromise that had been the basis for PJM's proposal. Load Serving Entities had favored the two new categorical exemptions, and generators had opposed unit-specific review. Because of

FERC's modifications, many Load Serving Entities got what they wanted, but many generators did not. By proposing that PJM adopt the two new exemptions alongside unit-specific review, FERC largely eviscerated the terms of the bargain between generators and Load Serving Entities. As a result, PJM ended up with an "entirely new rate scheme." *City of Winnfield*, 744 F.2d at 876. That is not permissible.

FERC says that it did not violate Section 205 because PJM consented to FERC's proposed modifications. A utility's consent is relevant when FERC proposes "minor" modifications to the utility's proposal. *Western Resources*, 9 F.3d at 1579. But when FERC proposes its "own original notion of a new form of rate," the utility's consent does not excuse a Section 205 violation. *City of Winnfield*, 744 F.2d at 875.

In those circumstances, the utility's consent is inadequate because consent does not cure the harms to the utility's customers. Section 205 protects the utility's customers by ensuring "early notice – in the rate proposal itself – of the sort of rate increase that is sought." *Id.* at 876. When FERC "imposes an entirely new rate scheme" in response to a utility's proposal, the utility's customers do not have adequate notice of the proposed rate changes or an adequate opportunity to comment on the proposed changes. *Id.* That was the case here. Generators and Load Serving Entities had an opportunity to comment on the original compromise proposal submitted by PJM. But they did not have an opportunity to comment on FERC's modifications before FERC issued its decision. They also did not have an adequate opportunity to comment in the request for rehearing. As FERC has previously explained: "Parties seeking rehearing of Commission orders are not permitted to include additional evidence in support of their position, particularly when such evidence is available at the

time of the initial filing." *PJM Interconnection, LLC*, 108 FERC ¶ 61,187, at ¶ 49 (2004). PJM's stakeholders therefore could not fully contest FERC's modifications with new evidence on rehearing. As a result, PJM's stakeholders lacked the protections provided by Section 205. PJM's consent did not restore those protections.

\* \* \*

In sum, FERC exceeded its authority under Section 205. We grant the petitions for review and vacate FERC's Orders with respect to unit-specific review, the competitive entry exemption, the self-supply exemption, and the mitigation period. We remand the matter to FERC.

*So ordered.*