# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 6, 2024          Decided January 21, 2025

No. 23-1089

HECATE ENERGY LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PJM INTERCONNECTION, L.L.C.,
INTERVENOR

---

Consolidated with 23-1182

---

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

---

*Aaron M. Streett* argued the cause for petitioner. With him on the briefs were *Michael A. Yuffee*, *J. Mark Little*, and *Christopher E. Tutunjian.*

*Angela X. Gao*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and

*Robert H. Solomon. Susanna Y. Chu*, Attorney, entered an appearance.

*Wendy B. Warren* argued the cause for intervenor in support of respondent. With her on the brief were *Elizabeth P. Trinkle* and *David S. Berman*.

Before: HENDERSON, PILLARD, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:   Hecate Energy, LLC, develops and operates facilities to generate and store renewable power. It petitions for our review of two Federal Energy Regulatory Commission orders that approve comprehensive reforms proposed by PJM Interconnection, LLC, a regional transmission grid operator, to the criteria PJM uses to process requests to connect new electricity sources to the electrical grid. One issue PJM faces in processing interconnection requests is whether connecting new sources will require upgrades to the grid and, if so, how upgrade costs will be allocated among generators seeking to connect. Hecate challenges a single aspect of FERC's orders: Its approval of PJM's proposal to help clear its backlog of pending interconnection requests by expediting requests that are projected to be assessed upgrade costs of $5 million or less. FERC defends its orders on the merits, but it first contests Hecate's standing to challenge the orders in court. We hold that Hecate lacks Article III standing to challenge the $5 million cap, and therefore dismiss its petitions for review. Hecate's injury is not redressable because the relief it requests from this court—vacatur of FERC's approval of PJM's comprehensive reform package—is unlikely to lead to the expediting of its over-$5 million project.

**BACKGROUND**

**A.**

Section 205 of the Federal Power Act requires electric utilities' rates and rules for transmitting electricity to be "just and reasonable" and not "undu[ly] preferen[tial]." 16 U.S.C. § 824d(a), (b). Under Section 205 and the Federal Energy Regulatory Commission's (FERC or Commission) implementing regulations, when a regional transmission organization like PJM seeks to change any rates or rules, it must file the proposed changes with the Commission. *Id.* § 824d(d); 18 C.F.R. § 35.34(j)(1)(iii). "FERC must accept proposed rate changes filed under Section 205 so long as the changes are just and reasonable" and not unduly discriminatory. *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 113 (D.C. Cir. 2017); 16 U.S.C. § 824d(a), (b).

In evaluating proposed rule changes under Section 205, FERC plays "an essentially passive and reactive role." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (internal quotation marks omitted). "FERC may accept or reject the proposal," but it may not "suggest modifications that result in an entirely different rate design than the utility's original proposal or the utility's prior rate scheme." *NRG Power*, 862 F.3d at 114-15 (internal quotation marks omitted). The Commission may not propose modifications that "und[o] the compromise that had been the basis for [the] proposal" or "eviscerate[] the terms of the bargain" underlying the original proposal. *Id*. at 116.

**B.**

PJM is a regional transmission organization—an independent, non-profit, FERC-approved entity that manages the electrical grid covering parts of 13 Mid-Atlantic and

Midwestern states and the District of Columbia. *See Advanced Energy*, 860 F.3d at 659. One of PJM's responsibilities is to facilitate the interconnection of new power sources to the grid. *See FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 443 (D.C. Cir. 2005). That process involves conducting multiple studies to determine what network upgrades (if any) are necessary to support the connection of new generators to the grid, and how the costs of those required upgrades—which "improve the network for the benefit of all users," *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1212-13 (D.C. Cir. 2009)—should be allocated among the various generators seeking to connect. *See Marcus Hook*, 430 F.3d at 443.

For decades, PJM has used a serial, "first-come, first-served" model for acting on interconnection requests, in which "[t]he submission of an interconnection request triggers a review by [PJM] and holds the requestor's place in the interconnection queue" until PJM conducts the requisite studies, allocates network upgrade costs, and provides the generator with a proposed interconnection service agreement. *ESI Energy, LLC v. FERC*, 892 F.3d 321, 325 (D.C. Cir. 2018). In recent years, that serial, "first-come, first-served" model has not kept up with the rising number of interconnection requests, leading to delays in connecting new generators to the grid.

The current system's rules incentivize project developers to submit speculative and duplicative interconnection requests that they often withdraw late in the study process. For example, submitting an interconnection request is relatively cheap, there are few requirements for a project to keep its place in the queue, and projects may withdraw from the queue at any time with minimal financial penalty. In fact, the vast majority of interconnection requests are withdrawn before the requestor signs a final interconnection service agreement: Of requests submitted between January 2020 and February 2021, 80% were

withdrawn during the review process. In addition, PJM determines and assigns network upgrade costs based in part on a project's queue position relative to other requests. For instance, if there is still enough excess capacity in the grid to accommodate the connection of another generator, a project submitted earlier in time might not have to pay for network upgrades necessitated by the connection of generators farther down in the queue. *See Marcus Hook*, 430 F.3d at 444. Because of that, almost every withdrawal requires PJM to re-study and potentially re-allocate network upgrade costs among the projects that remain in the queue behind the withdrawn project. Given large increases in the number of interconnection requests in recent years, the rules countenancing such a grossly inefficient cycle of withdrawals and restudies have hamstrung PJM's ability to timely connect new generators to the grid and contributed to a backlog of 1,857 interconnection requests in various stages of study.

To address those issues, PJM organized a two-and-a-half-year process during which its stakeholders developed, negotiated, and approved a comprehensive package of reforms to PJM's interconnection process. The proposed reforms—approved by 87% of PJM's Markets and Reliability Committee and 90% of PJM's Members Committee—are designed to transition PJM to a cluster-based approach. Under that new approach, all interconnection requests submitted during a defined time period are grouped together for joint study and cost allocation in one review cycle. By enabling a single study and simultaneous cost allocation to all projects within a review cycle, and by also limiting project modifications and withdrawals to specific periods during the cycle, the cluster-based approach eliminates the need for iterative, inefficient restudies. Those changes allow PJM to perform a single "retool" study of previously performed analyses at the end of the cycle to account for all withdrawals during the cycle. The

proposed reforms also aim to reduce the number of speculative requests and late-stage withdrawals by imposing more stringent requirements for projects to enter and remain in the interconnection approval process.

The reform package also includes exhaustively negotiated rules governing the transition from PJM's legacy, serial process to the new cluster-based approach. While most stakeholders wanted their pending projects to remain under the serial process, PJM sought to quickly transition to the cluster-based process so it could more efficiently clear its large backlog of requests. To balance those competing interests in serial versus cluster-based consideration, the transition rules temporarily preserve a serial "Expedited Process" open to projects submitted between April 2018 and September 2020 whose network upgrade cost allocation is estimated at $5 million or less. Under the transition rules, PJM will first serially consider and allocate costs to projects under the Expedited Process. It will then study and act on all other projects under the new cluster-based approach.

The $5 million cap for Expedited Process eligibility was a "carefully negotiated term that active PJM stakeholders debated extensively during the stakeholder process," including by "discuss[ing] alternative proposals for the transition mechanism at great length" and "debat[ing] the impacts such proposals would have on projects in the various queue windows," and on PJM's ability to clear its backlog. Comments in Support of Pine Gate Renewables, LLC and Cypress Creek Renewables, LLC at 9 (J.A. 391). Indeed, of all of the aspects of the proposed reforms, "the question of a [t]ransition process and how it should be structured involved the most compromise among stakeholders in order to achieve the consensus that was reached on the overall reform package."

PJM Tariff Revisions for Interconnection Process Reform at 42 (J.A. 80).

## C.

In June 2022, PJM filed its final package of proposed reforms for the Commission's approval under Section 205. Hecate intervened, filing a "limited protest" to PJM's proposed reforms. Mot. to Intervene and Limited Protest of Hecate Energy LLC at 1 (J.A. 295). Hecate was "generally very supportive" of the reform package but asked the Commission to reject the $5 million cap for eligibility in the Expedited Process. *Id*. Hecate argued that the $5 million cutoff for participation in the limited extension of project-specific, first-to-file processing was both "arbitrary" and "unduly discriminatory" because, it claimed, PJM failed to advance an evidence-based, rational justification for distinguishing between projects below and above its proposed $5 million cap. *Id*. at 7-12 (J.A. 301-06).

The Commission approved PJM's proposed package of reforms, including the $5 million cap for inclusion in the Expedited Process and cluster-based review for more expensive projects and for projects submitted after September 2020. FERC denied Hecate's request for rehearing. In both its order accepting PJM's reforms and its order explaining its denial of Hecate's rehearing request, the Commission determined that PJM had reasonably justified the $5 million cap in light of its experience that projects assigned network upgrade costs of up to $5 million were simpler and quicker to process than those assigned costs above $5 million.

Hecate petitioned for our review of both orders. We granted PJM's motion for leave to intervene in support of the Commission.

## DISCUSSION

Hecate argues that the Commission acted arbitrarily and capriciously in concluding that the $5 million cap was not "unduly discriminatory" under Section 205. Specifically, Hecate maintains that the Commission's determination was not supported by substantial evidence because PJM's purported experience was insufficient and that it was arbitrary and capricious in its failure to consider alternative eligibility rules for the Expedited Process that include projects above the $5 million cutoff. We do not reach the merits arguments because Hecate lacks standing to raise them.

The "irreducible constitutional minimum" of standing has three familiar parts: injury in fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The party invoking federal court jurisdiction bears the burden of establishing each of those elements. *Id.*

Hecate's claimed injury-in-fact is the exclusion of at least one of its projects from the Expedited Process. Hecate has five projects pending in PJM's queue that will be sorted into either the Expedited Process or a cluster-based review cycle, depending on each project's estimated assigned network upgrade costs. At least one of those projects has such assigned costs of over $5 million and is therefore excluded from the Expedited Process. According to Hecate, that exclusion will cause it significant and expensive delays.

FERC argues that Hecate's claimed injury is too speculative to satisfy the injury-in-fact requirement because one or more of its four other pending projects may be eligible for the Expedited Process, which means that Hecate could enjoy a net benefit from the Expedited Process eligibility rules it challenges. We need not embrace the Commission's net-

benefit theory or determine whether Hecate has otherwise alleged an injury-in-fact because, even if it has, it fails to demonstrate that its claimed injury is redressable.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc). As we have previously stated, "[t]he key word is 'likely.'" *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (quoting *Lujan*, 504 U.S. at 561). When, as in this case, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"—here, PJM—"redressability . . . hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562. That makes it "substantially more difficult to establish" redressability, as it would depend on future choices by PJM, "whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id*. (internal quotation marks omitted). Indeed, we recently noted that redressability in cases where "plaintiffs sue the government in order to change third-party behavior" imposes "a significant barrier [to establishing standing]—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." *Johnson v. Becerra*, 111 F.4th 1237, 1244 (D.C. Cir. 2024).

Such an injury is still redressable if the court's action will "amount to a significant increase in the likelihood that the plaintiff w[ill] obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). But the record must "present[] substantial evidence of a causal relationship between the government policy and the third-party

conduct, leaving little doubt as to . . . the likelihood of redress." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004). If it is instead "just as plausible" that the court's action will not redress the plaintiff's injury as that it will, Article III's redressability requirement is not met. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43-46 (1976). Put otherwise, "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment" do not suffice; "[r]ather than guesswork, [] plaintiffs must show that the third-party [actor] will likely react in predictable ways to the defendants' conduct." *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024) (internal quotation marks omitted).

For instance, in *Simon v. Eastern Kentucky Welfare Rights Organization*, the plaintiffs challenged an IRS revenue ruling rescinding the requirement that hospitals offer free healthcare to low-income populations in order to receive favorable tax treatment. 426 U.S. at 28-32. The plaintiffs, who lived below the poverty line, alleged that the ruling injured them by depriving them of free hospital services. *Id.* at 32-33, 40-41. As relevant to redressability, they contended that ordering the IRS to rescind the revenue ruling would cause the hospitals to resume providing the free services in order to retain the favorable tax treatment attending nonprofit status. *Id.* at 42-43. The Court rejected that argument, holding that the plaintiffs failed to demonstrate redressability because it was "just as plausible" that, if the Court invalidated the revenue ruling, the hospitals would "elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* at 43. The plaintiffs accordingly failed to allege a "substantial likelihood" that their injury would be redressed by "victory in this suit." *Id.* at 45-46.

*Utah v. Evans* further demonstrates the tight causal connection between the plaintiff's requested relief and the

redress of their asserted injury necessary to establish standing. There, Utah complained that the Census Bureau's unlawful use of a particular method of imputing census data had overcounted North Carolina's population relative to Utah's, causing Utah to lose a House seat to North Carolina. *Evans*, 536 U.S. at 457-59. Utah sought an injunction ordering the census officials to recalculate the population numbers and recertify the official census result—relief that the courts could order. *Id*. at 459-61. But Utah's injury would be redressed only if the President then submitted those recertified numbers to Congress and the Clerk of the House of Representatives sent certificates to each state specifying the number of representatives to which they were entitled. *Id*. at 461. The Court held that Utah's injury was redressable because it was "substantially likely that the President and other executive and congressional officials" would carry out the "purely mechanical" "calculations and consequent apportionment-related steps" necessary to convert the court-ordered census report into an additional representative for Utah. *Id*. at 463-64 (internal quotation marks omitted).

Utah's injury was redressable in *Evans* because, even though the court's action would not directly redress the injury, it would very likely spur the next steps necessary to redress it. By contrast, in *Simon* the plaintiffs' injury was not redressable because, given the various considerations in play, the hospitals were just as likely to continue to deny plaintiffs free services as they were to reverse course in response to a court order changing the tax implications of the denial. 426 U.S. at 43-44.

Hecate's situation is akin to that of the plaintiffs in *Simon*. Hecate asks us to vacate FERC's order approving the $5 million cap as arbitrary and capricious. But Hecate does not show that our doing so would make it likely—let alone "substantially likely," *Evans*, 536 U.S. at 464—that its

requested relief would spur PJM to take the additional steps necessary to include Hecate's project in its Expedited Process. Rather, it is "just as plausible" (and in fact more plausible) that its injury would not be redressed by its requested relief.

Hecate's injury would be redressed only if, after our vacatur, PJM re-submitted its complete package of proposed reforms with a change to the Expedited Process eligibility rules to include at least some projects, including Hecate's, assessed over $5 million in network upgrade costs. But, given PJM's aims, incentives, and independent decisionmaking authority, that outcome is particularly unlikely. Both the Commission and this court lack the authority in response to Hecate's claim to direct PJM to make that change. And PJM would have a wide array of options for curing the alleged defect with the $5 million cap that do not involve—and are more conducive to its goals than—expediting projects assessed over $5 million in network upgrade costs.

Recall that in a Section 205 proceeding, "the Commission undertakes an essentially passive and reactive role and restricts itself to evaluating the confined proposal." *Advanced Energy*, 860 F.3d at 662 (internal quotation marks omitted). "FERC may accept or reject the proposal," and it can suggest "minor" modifications to the proposal. *NRG Power*, 862 F.3d at 114-15. But it cannot insist on or even suggest modifications that "result in an entirely different rate design than the utility's original proposal," including modifications that "und[o] the compromise that had been the basis for PJM's proposal" and "eviscerate[] the terms of the bargain" underlying the original proposal. *Id*. at 114-16 (internal quotation marks omitted).

The eligibility rules for the Expedited Process, including the $5 million cap, were the subject of extensive negotiation and compromise among PJM's stakeholders. Under the

strictures described in *NRG Power*, the Commission thus cannot modify PJM's proposal by removing the $5 million cap, as Hecate concedes. If we were to vacate FERC's orders, the Commission would have no choice but to reject PJM's entire package of reforms, at which point PJM would be free to re-submit a new comprehensive proposal to attempt to cure the putative arbitrariness of the challenged $5 million cap.

There are a number of ways PJM could accomplish that goal. If we were to hold that PJM failed to support the $5 million cap with substantial evidence, PJM might bolster its evidentiary basis for using $5 million as the dividing line between relatively simple, quick-to-process projects and more complex, time-intensive ones. Evidence that the cap is a non-arbitrary basis of distinction would cure the claimed defect because "mere differential treatment of two entities" does not violate Section 205; rather, it amounts to undue discrimination "only if the entities are similarly situated, such that there is no reason for the difference." *City of Lincoln v. FERC*, 89 F.4th 926, 935 (D.C. Cir. 2024) (internal quotation marks omitted). But such a fix would do nothing to afford Hecate the expedited treatment it seeks. Alternatively, if we held that the Commission unjustifiably failed to consider alternatives to the $5 million cutoff by which PJM could accomplish its goals while expediting projects like Hecate's, PJM might demonstrate on remand why those alternatives do not accomplish the necessary objectives advanced by the $5 million rule. Again, that fix would not redress Hecate's injury.

Taking a different tack, PJM could abandon the $5 million cap and select an entirely different rule governing eligibility for the Expedited Process with no guarantee that the new rule would encompass Hecate's project. For instance, PJM might expedite only projects submitted before a certain date or pending for a certain duration. Or, as the Commission noted in

its Rehearing Order, PJM could abandon the Expedited Process entirely. That would eliminate the $5 million limit Hecate views as arbitrary, but would provide no expedited treatment to any project, including Hecate's.

As these examples illustrate, a court order invalidating the $5 million cap leaves PJM with myriad options that would resolve the defect without redressing Hecate's asserted injury of exclusion from the Expedited Process. Thus, while it is possible that vacatur of the Commission's order would expedite Hecate's project, that outcome cannot fairly be described as "likely."

Indeed, it is particularly *unlikely* that PJM would adopt a rule allowing projects with over $5 million in assessed network upgrade costs to participate in the Expedited Process. In its filing requesting FERC's acceptance of its proposed tariff reforms, PJM explained that expanding access to the Expedited Process "would not only be contrary to the results of the stakeholder process, but would delay implementation of PJM's Cycle process, and harm PJM's efforts to clear its interconnection backlog." PJM Tariff Revisions for Interconnection Process Reform at 42 (J.A. 80). In light of the critical necessity of clearing its backlog and quickly transitioning to a cycle-based process, PJM is unlikely to choose to expand the Expedited Process as Hecate urges.

The likelihood that PJM would expand the Expedited Process is further diminished given that PJM's stakeholders earlier expressly rejected at least one such proposal. During the stakeholder process, Hecate proposed modifying the $5 million cap so that projects assessed network upgrade costs over $5 million would be allowed to enter the Expedited Process so long as the developer posted security covering the costs allocated to that project. Only 30% of stakeholders

expressed support for that proposal, which is far short of the required two-thirds majority needed for approval. While changed circumstances could conceivably affect the degree of stakeholder support, that failed vote demonstrates stakeholders' negative reaction to the proposed expansion of the Expedited Process in a way that would include Hecate's project.

In sum, if we were to vacate the Commission's orders under either of Hecate's theories, PJM would have multiple avenues for correcting the deficiency that would be more conducive to its goals than modifying the Expedited Process eligibility rules in a way that expedites its review of Hecate's over-$5 million project. It is thus not only "just as plausible," but in fact more plausible that PJM would respond to Hecate's "victory in this suit" with a new package of proposed reforms that would not provide Hecate the expediting it seeks. *Simon*, 426 U.S. at 43-46. Accordingly, Hecate has failed to demonstrate that its injury is redressable.

This result accords with our many other decisions applying *Simon*, in which we have held that plaintiffs fail to establish redressability when their injury is caused by "third parties who took actions because of allegedly unlawful agency decisions, but who would have no compelling reason to reverse those actions were the decisions held unlawful by a court." *Bennett v. Donovan*, 703 F.3d 582, 587 (D.C. Cir. 2013). For instance, in *National Wrestling Coaches Ass'n v. Department of Education*—"[o]ur seminal case discussing standing in the context of a regulated third party," *Bennett*, 703 F.3d at 587— several men's wrestling organizations challenged Title IX guidance documents issued by the Department of Education, claiming they incentivized schools to eliminate men's wrestling programs. *Nat'l Wrestling*, 366 F.3d at 934-36. We held that revoking the guidance would not redress the

plaintiffs' asserted injury because schools had independent reasons "unrelated to the challenged legal requirements" not to reinstate men's wrestling teams, regardless of the challenged guidance. *Id*. at 939-40. Similarly, in *Renal Physicians Ass'n v. U.S. Department of Health & Human Services*, 489 F.3d 1267 (D.C. Cir. 2007), a medical association challenged an agency regulation that allegedly caused clinics to reduce the wages of the association's members. *Id*. at 1271. We held that its injury was not redressable because, even if the regulation were invalidated, the clinics would have independent economic reasons to continue paying the reduced wages. *Id*. at 1276-78. And in *Johnson v. Becerra*, Medicare beneficiaries with chronic illnesses challenged agency policies that allegedly facilitated home health companies' denial of services to chronically ill Medicare patients. 111 F.4th at 1242-43. We held that the lack of service was not redressable because the home health companies had "many economic and practical reasons" to continue denying service regardless of the agency's policies. *Id*. at 1245-46.

Hecate's situation presents a slight variation on these cases, in that respondent FERC did not require PJM to impose the challenged $5 million cap on expedited review; PJM did so of its own accord, subject to FERC approval. But this case shares the key characteristic fatal to redressability that reversing the agency's action will not remove PJM's incentive or ability to continue inflicting the asserted injury—here, excluding Hecate's project from expedited review. That scenario makes it unlikely, in the absence of other indications, that reversing the agency's action will redress the claimant's injury. Here, for instance, for all the reasons discussed above, even if we were to invalidate FERC's approval of the $5 million cap as arbitrary and capricious, PJM would have other, independent reasons and means to exclude Hecate's project

from expedited review, making it unlikely that vacating the Commission's orders would redress Hecate's injury.

Importantly, Hecate does not suggest—nor do we see how it could—that its injury stems from the Commission's failure to follow proper procedures, and that it is thus entitled to establish redressability under the relaxed standard that recognizes standing based on procedural injuries without the claimant "having to show that proper procedures would have caused the agency to take a different substantive action." *Renal Physicians*, 489 F.3d at 1278-79. Nor does Hecate contend that the allegedly arbitrary exclusion of its project from the Expedited Process inflicts a stigmatic, "noneconomic" injury by signaling that Hecate is a member of an "innately inferior" group of "less worthy participants in the political community," such that simply eliminating the Expedited Process would redress its injury. *Heckler v. Mathews*, 465 U.S. 728, 739 (1984) (internal quotation marks omitted). Rather, Hecate asserts a run-of-the-mill substantive economic injury that must meet the ordinary standards for redressability, which require Hecate to show that the relief sought will "likely alleviate" its asserted injury. *Fla. Audubon Soc'y*, 94 F.3d at 663-64.

Hecate contends that, under our decision in *Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), it has shown redressability insofar as an order from this court invalidating the $5 million cap would "diminish the obstacles" preventing it from gaining access to the Expedited Process. *Id*. at 1084. But, as we have explained, the mere "*possibility* that [petitioners] may have 'better odds' of [obtaining] their desired [relief] plainly falls far short of the mark." *Nat'l Wrestling*, 366 F.3d at 942. *Orangeburg* is not to the contrary. There, North Carolina power supplier Duke Energy agreed to the interstate sale of electricity to the city of Orangeburg, South Carolina at cheap, "native load" rates until a North Carolina

state agency enforced a state-regulatory condition on Duke—imposed as part of a merger agreement with another utility years earlier—that limited its native-load pricing to customers that agency approved. *Orangeburg*, 862 F.3d at 1074-76. Once the state agency denied approval to Duke's proposed contract for sale into South Carolina and decided to treat Duke as receiving phantom income from Orangeburg under state law (effectively suppressing the price Duke could charge its in-state customers), Duke backed out of the deal. *Id*. Orangeburg challenged FERC's approval of a later merger agreement that imposed the state agency's same pricing constraint on Duke, which in Orangeburg's view amounted to interstate wholesale rate regulation preempted by the Federal Power Act. *Id*. at 1076-77.

We held that Orangeburg's injury was redressable because this court's conclusion that the later merger agreement "enact[ed] a regime in which [the North Carolina state agency] [wa]s empowered to act as a gatekeeper for interstate wholesale power transactions[] in violation of [federal law]" would remove the primary obstacle to Orangeburg's ability to buy cheap power from Duke. *Id*. at 1083. "Such a determination" would make it "likely" (even if not certain) that Duke would again agree to sell to Orangeburg at native-load prices. *Id*. at 1084.

Granted, like PJM, the state agency in *Orangeburg* also had various options to choose from in reacting to this court's judgment that vacated FERC's approval of Duke's later merger agreement. Because the state agency was not directly bound by *Orangeburg*, it might have persisted in enforcing its regulatory ascription of phantom income to Duke under the earlier merger deal. After all, "[i]t is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability."

19

*Haaland v. Brackeen*, 599 U.S. 255, 294 (2023). And FERC had "repeatedly sidestepped the legal issues" and "declined to preempt [the state agency's] alleged gatekeeping regime" as part of a "pattern of acquiescence," so it was perhaps fair to assume that FERC would continue to tolerate some state encroachment on its jurisdiction going forward. *Orangeburg*, 862 F.3d at 1074, 1081.

However, *Orangeburg* is distinguishable from this case. It would be far easier for PJM to bolster its evidence for the $5 million cap or explain more thoroughly why it rejected Hecate's proposed alternatives than it would have been for the state agency in *Orangeburg* to somehow legitimate a scheme that impinged on FERC's exclusive jurisdiction. As we explained in *Orangeburg*, the state agency was "unlikely to maintain its policy" once it was "[f]aced with [] a decision from a federal court" declaring that policy unlawful. *Id*. at 1084. Even if the state agency did so with regard to Duke's earlier merger agreement, Orangeburg could contract with a different North Carolina utility to obtain cheap energy and point to *Orangeburg* if the state agency sought to block that deal.

Here, by contrast, there is no clear path from an order invalidating the $5 million cap to the likely inclusion of Hecate's projects in the Expedited Process. To the contrary, as we have explained, it is significantly more likely that PJM would remedy the defect Hecate claims via a modification that would not expedite the Hecate project at issue. Such a remote likelihood of redress defeats Hecate's claimed standing.

\*   \*   \*

For the foregoing reasons, the petitions for review are dismissed for lack of standing.

*So ordered.*