**D&F AFONSO REALTY TRUST, Petitioner,**

v.

**Jane F. GARVEY and Federal Aviation Administration, Respondents.**

No. 99–1129.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 2000.

Decided July 18, 2000.

District of Columbia to set aside agency regulations" promulgated to implement the re-

quirements of the Act.

Rachel B. Trinder argued the cause for petitioner. With her on the briefs was Craig M. Cibak.

William G. Cole, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were David W. Ogden, Acting Assistant Attorney General, and Robert S. Greenspan, Attorney.

Before: SILBERMAN, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

D&F Afonso Realty Trust petitions for review of the Federal Aviation Administration's issuance of an aviation hazard determination declaring the roof of a house constructed by the petitioner to be a navigational hazard. The FAA defends the procedure and evidence underlying its determination and also argues that the petitioner lacks standing to bring its case before this court. After considering several affidavits submitted by the petitioner, we conclude that it has Article III standing. We further conclude, based on a review of the administrative record, that the FAA inexplicably failed to follow established agency procedure, did not adequately explain its decision, and acted arbitrarily and capriciously in making its hazard determination. Therefore, we vacate and remand the agency's determination.

## I. Background

D&F Afonso Realty Trust ("D&F"), a husband and wife–owned construction company, decided to build a single family home in Hopedale, Massachusetts near a small, privately–owned airport. In October 1997, construction on the house began after the town of Hopedale issued construction permits to the company. After building commenced, D&F learned from the Massachusetts Aeronautics Commission that it needed to notify the Federal Aviation Administration ("FAA") about the structure in order for the FAA to determine whether the house would violate any federal regulations. D&F informed the New England Regional Office of the FAA about the house-in-progress in late December 1997 by having its engineering firm file with the agency a Notice of Proposed Construction or Alteration (FAA Form 7460–1) required by 14 C.F.R. § 77.17 to be submitted at least thirty days before the earlier of either the start date of construction or the construction permit's filing date. In early January, D&F informed the FAA of the house's completion.

After reviewing D&F's filing, the FAA determined that the completed house exceeded one of the air navigation obstruction standards listed in 14 C.F.R. § 77.25. Specifically, the FAA found that 16.1 feet of the house's roof penetrated one of the "imaginary surfaces" around the airport.

An imaginary surface is essentially an artificial engineering boundary "drawn" in the air around airports. The imaginary surface at issue here is the "transitional surface" which extends "outward and upward at right angles to the runway centerline and the runway centerline extended at a slope of 7 to 1 from the sides of the primary surface and from the sides of the approach surfaces." 14 C.F.R. § 77.25(e). Because the roof penetrated the transitional surface, the FAA initiated an administrative inquiry to ascertain whether the structure would present a hazard to air navigation around the airport.

Specifically, the FAA began an "aeronautical study" because the house exceeded a Part 77 obstruction standard. Part 77 of the Federal Aviation Regulations "establishes standards for determining obstructions to air navigation." 14 C.F.R. § 77.21(a). The FAA uses the standards to evaluate whether an object represents a hazard to air navigation. *See id.* §§ 77.31–39 (Subpart D).

At the conclusion of the study, the FAA made a finding that the house had a substantial adverse effect on air navigation and issued a determination of hazard. The FAA concluded, without further explanation, that because the house "is immediately adjacent to the final approach course" for the runway, "it represents a hazard to all aircraft landing on [the] runway." In justifying the substantial adverse effect finding, the FAA concluded, without explanation, that the house would adversely affect all arrivals using Visual Flight Rules. Given the FAA's cursory reference to some aerial photographs showing the house's proximity to the runway's final approach course, the agency apparently relied *sub silentio* on the photographs as the core support for its hazard determination.

D&F sought administrative review of the FAA's determination and requested a hearing. The FAA denied D&F's request for a hearing and issued a final determination upholding its prior conclusions. In explaining its position, the FAA stated:

[T]he proposed structure would lie within the Hopedale ... runway ... traffic pattern buffer. This buffer area is designed to provide a degree of protection for those pilots, departing and landing at an airport, operating in accordance with visual flight rules (VFR).... [B]ecause of the proposed structure's height and its relative position within the traffic pattern buffer, it is the FAA's position that the planned structure would be a distraction to pilots during a critical phase of flight.

To effectuate its findings, the FAA published a warning to pilots to "use extreme caution when landing ... due to a two–story house located approximately 400' northwest of the runway threshold."

In addition to the FAA finding the house to be a hazard to air navigation, the Massachusetts Aeronautics Commission determined that the house penetrated certain protected airspace in violation of the Code of Massachusetts Regulations. After the administrative findings came to light, the Hopedale Airport asked the town to remove the house. Currently, the town of Hopedale refuses to issue an occupancy permit to D&F. In light of the foregoing events, D&F seeks review of the FAA's hazard determination and asks this court to reverse the FAA's determination in an effort to obtain an occupancy permit from the town as a result.[1]

## II. Discussion

### A. *D&F's Standing*

■ The FAA challenges D&F's standing to bring this appeal. In order to

---

**1.** Subsequent to D&F's filing a Petition for Review in this court, the FAA issued a new policy which, with certain exceptions, makes exceeding "[t]he height of the transition surface (other than abeam the runway)" a per se hazard. Policy Memorandum 99–02. We will not analyze this case under the new poli-

cy. We leave consideration of the new policy to the FAA because the agency, not this court, must interpret and apply a new agency policy in the first instance. *See NLRB v. Food Store Employees Union, Local 347*, 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974).

establish Article III standing, D&F must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, ——, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (en banc). D&F established an actual and concrete and particularized injury consisting of a diminution in property value due to its inability to obtain an occupancy permit from the town. The FAA argues, however, that D&F has not shown a causal link between the agency's hazard determination and D&F's injury, given the Massachusetts Aeronautics Commission and airport's independent objections to the house. The FAA also challenges the ability of this court to redress D&F's injury by reversing the agency because the town, not the agency, controls permit issuance.

If the FAA hazard determination independently diminished the house's property value or constituted the only factor motivating the town's denial of the occupancy permit, causation and redressibility would be non-issues because our reversal of the FAA would either provide a remedy for the financial injury caused by the FAA or prompt the town to issue the permit. However, neither the record nor the briefs submitted to this court established which of the events among the FAA's findings, the Massachusetts Aeronautics Commission's findings, the airport's complaint, or some combination thereof prompted the town's denial of the occupancy permit and the diminution in property value. However, at oral argument, D&F asserted that the FAA's hazard determination in and of itself caused a diminution in property value and that the town was withholding the occupancy permit solely due to the FAA's hazard determination. Therefore, we afforded D&F the opportunity to submit affidavits supporting its allegations, if true.

Upon review of D&F's submissions, we conclude that D&F alleges facts satisfying the standing requirements of causation and redressibility. D&F supplied an affidavit explaining that "a real estate broker ... informed [D&F] that the FAA's Hazard Determination has resulted in a diminution of value to the Afonso House independent of whether an occupancy permit is granted." In addition, D&F submitted an affidavit establishing that the Massachusetts Aeronautics Commission would "defer to the outcome of the FAA-related proceedings currently before this Court." Moreover, D&F supplied an affidavit from the Hopedale Building Commissioner declaring that "the only obstacle to issuance of the occupancy permit is the FAA's Hazard Determination. But for that Determination, the occupancy permit would have already issued. If the FAA's Hazard Determination is withdrawn or reversed, [the town] will issue an occupancy permit for the Afonso House forthwith." We must construe the statements made in the affidavits in the light most favorable to the petitioner. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Taken together, the statements show that the FAA's hazard determination causes D&F injury in the form of diminished property value and comprises the sole obstacle between D&F and an occupancy permit. Therefore, we conclude that D&F has standing to challenge the FAA's hazard determination.

B. *The Hazard Determination*

■ We review decisions of federal agencies, including the FAA, under the standards set forth by the Administrative Procedure Act. *See Public Citizen, Inc. v. FAA,* 988 F.2d 186, 196 (D.C.Cir.1993). That Act provides that a reviewing court must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). As we have often held, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result. . . ." *Public Citizen*, 988 F.2d at 197. In the hazard determination under review, the FAA has offered no such explanation. As we have stated before, we must strike down agency action if the agency failed to consider relevant factors or made a clear error of judgment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Starr v. FAA*, 589 F.2d 307, 311 (7th Cir.1978).

█ The FAA made a finding that the house penetrated an imaginary surface, specifically the transitional surface. However, mere penetration, and even evidence of adverse effect alone, do not provide adequate support for a hazard determination. In dealing with obstruction standard violations, the FAA follows a handbook entitled "Procedures for Handling Airspace Matters," FAA Procedures 7400.2D (1993) ("Handbook"), which mandates conducting aeronautical studies, in accordance with Subpart D of Part 77, of proposed structures exceeding Part 77 obstruction standards. *See* Br. for FAA at 4 (citing chapter 5 of Handbook). According to Subpart D of Part 77, "[i]n the aeronautical studies, present and future . . . aeronautical operations and procedures are reviewed and any possible changes in those operations and procedures and in the construction proposal that would eliminate or alleviate the conflicting demands are ascertained." 14 C.F.R. § 77.31. Pursuant to the Handbook, objects exceeding an obstruction standard are "presumed to be hazards to air navigation unless an aeronautical study determines otherwise." *Id.* at § 7–1(b). In order to issue a hazard determination, the FAA must find by a clear showing that the penetration in question will have a "substantial adverse effect" on air navigation. *See id.* at §§ 7–2 to 7–5, 8–2. The Handbook provides that "substantial adverse effect" occurs when a structure has or would have an "[a]dverse effect" and "a significant volume of aero-nautical operations would be affected." *Id.* at § 7–4.

A substantial adverse effect finding requires three elements. First, the structure in question must have exceeded the relevant obstruction standards or have been found to have a physical or electromagnetic radiation effect on the operation of air navigation facilities. *See id.* at § 7–3. Second, the structure will be considered to have an adverse effect if it would, *inter alia*, "require a [Visual Flight Rules] operation," that is, an operation in which the pilot lands an aircraft or takes off using visual approach procedures only, "to change from a regular flight course or altitude," "[d]erogate airport capacity/efficiency," or "[a]ffect future [Visual Flight Rules] . . . operations indicated by plans on file." *Id.* Third, the structure must affect a significant volume of aeronautical activity; the FAA considers the type of activity involved and the frequency of occurrence. *See id.* at § 7–5. In addition, a study must include, *inter alia*, an evaluation regarding marking and lighting the structure, *see id.* at § 7–9, and every hazard finding is supposed to include "a clear, but brief, statement why aviation can or cannot accommodate the proposal." *Id.* at § 8–2.

Here, the FAA first sought comments from twenty-four interested parties concerning the effect the house would have on aviation. Apart from the manager of the Providence, Rhode Island Traffic Control Tower who declared, without further elaboration, that the house "would result in a negative impact to air traffic operations," the responding parties either did not object to the house or failed to provide any comments pertaining to the hazardousness of the structure.

Based on the FAA's explanation, or lack thereof, in the issuance of this hazard determination, we conclude that the FAA acted arbitrarily by issuing a hazard determination inconsistent with established standards. Thus, we hold that the FAA exceeded the permissible bounds of agency action.

Nowhere in the record before us can we find a link between established hazard determination standards and the hazard determination reached by the FAA in this case. The FAA made a finding that the house penetrated an imaginary surface. However, as we previously noted, mere penetration, and even evidence of adverse effect alone, cannot support a hazard determination. *See* Handbook §§ 7–3, 7–4, 8–2. According to the Handbook, the FAA is to conduct a "substantial adverse effect" inquiry and only upon a clear showing of substantial adverse effect issue a hazard determination. *See id.* at §§ 7–1, 7–3, 7–4, 8–2(b)(3). However, here, the FAA failed both to conduct a complete inquiry and make a clear showing of substantial adverse effect.

More specifically, the FAA arbitrarily based its hazard finding on an unsupported pilot distraction finding instead of following the policy outlined in the controlling Handbook. "We review the FAA's findings of fact merely to see whether they are 'supported by substantial evidence.'" *Public Citizen*, 988 F.2d at 196 (quoting 49 U.S.C.App. § 1486(e) (1988)). Here, if there is substantial evidence, the FAA has not alluded to it.

The FAA also acted contrary to its own procedure by failing to explicitly apply the established multi-factor test which considers adverse effect and the volume of operations affected. *See* Handbook §§ 7–3 to 7–5. For example, the FAA based its finding on the house's effect on VFR operations but failed to consider the relevant VFR adverse effect factors of potential changes in flight course and potential effects on future VFR operations. *See id.* at § 7–3. In addition, the agency did not investigate the available airport traffic figures and instead based its "significant volume" finding on the "proximity of [the] structure to the final approach course." Even assuming the FAA's reference to a traffic buffer zone in the order affirming the hazard determination has meaning as a technical and practical matter, the agency did not do its job of connecting the buffer zone concept to the "substantial adverse effect" inquiry. In short, the FAA did not consider relevant factors or sufficiently explain the basis of its hazard determination.

The FAA's post hoc rationalizations for deviating from procedure and for failing to substantiate its hazard determination cannot pass muster as a matter of law. For example, the Handbook requires that every aeronautical study include an evaluation regarding the marking and lighting of the structure in question. *See id.* at § 7–9. However, the agency did not make any findings concerning the marking or lighting of the house. The agency cannot claim to be engaging in reasoned analysis when it cavalierly brushes off specific mandates such as a marking and lighting evaluation. Nor can it claim to be acting reasonably when it ignores, without explanation, policy provisions such as the one establishing the inclusion of "a clear, but brief, statement why aviation can or cannot accommodate [a] proposal." *See id.* at § 8–2.

Moreover, the agency inexplicably refused to take into consideration the trees and other structures in the vicinity also apparently intruding into the transitional surface in the surrounding terrain which might alter the geometry of its calculations. In *Aircraft Owners and Pilots Association v. FAA*, 600 F.2d 965 (D.C.Cir. 1979), we recognized that surrounding terrain could possibly "mitigate what might otherwise have been a potential hazard to aircraft." *Id.* at 973. In other words, the FAA should have considered the landscape in its entirety when making its hazard determination. *See id.* Yet, according to the FAA, only D&F's house presents cause for concern. All in all, the FAA failed to rationally substantiate or explain its process and findings.

In essence, the FAA adopted an *ipse dixit* approach to making a hazard determination: the house creates a navigational hazard because the agency says so. Even our highly deferential standard of review requires more than the FAA offers. Thus, the FAA's abandonment of its own established procedure and its lack of reasoned

analysis on the record constitute arbitrary and capricious agency action in violation of the law. Due to the shortcomings in the FAA's hazard determination, we reverse and remand D&F's case to the agency in order for it to undertake an appropriate hazard analysis.

### III. Conclusion

In sum, we hold that D&F has alleged facts sufficient for standing to challenge the FAA's hazard determination. Upon review, we vacate and remand the FAA's determination due to the agency's engaging in an arbitrary and capricious hazard determination procedure.