# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 19, 2026          Decided May 29, 2026

No. 25-1150

MODERNWEST LONGMONT, LLC,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

---

On Petition for Review of a Final Order
of the Federal Aviation Administration

---

*M. Roy Goldberg* argued the cause and filed the briefs for petitioner.

*Caroline D. Lopez*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Brett A. Shumate*, Assistant Attorney General, and *August E. Flentje*, Attorney.

Before: PILLARD and GARCIA, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

2

EDWARDS, *Senior Circuit Judge*: Petitioner ModernWest Longmont, LLC ("ModernWest") is a property development company that seeks to build mixed-use housing developments directly under the approach and departure paths of a federally funded, public-use airport operated by the City of Longmont, Colorado ("the City") in its capacity as an airport sponsor. ModernWest needs approval from the City to proceed with its plans. However, after a lengthy permitting process, the City effectively denied ModernWest's proposal. ModernWest then filed a petition for review with this court seeking to abrogate messages sent by the Federal Aviation Administration ("FAA") to the City prior to its decision, advising the City that the proposed housing developments would violate a grant assurance upon which the airport's federal funding is conditioned. ModernWest claims that FAA's letters caused the City to reject the proposal and asks that FAA be ordered to vacate and withdraw the letters so the City can revisit the issue.

We dismiss ModernWest's petition for lack of standing. ModernWest "offer[s] nothing but speculation to substantiate [its] claim that a favorable decision from this court will redress [its] injuries by altering [the City's] independent decision[]." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004). In other words, ModernWest has failed to show that its requested relief, vacatur and withdrawal of FAA's letters, is likely to result in the City redressing its injury by approving the proposed housing development. In addition, in seeking review with this court, ModernWest failed to comply with our requirement that it argue standing, and furnish evidence of standing, in its opening brief. This briefing deficiency also requires us to dismiss the petition for review.

## I. BACKGROUND

### A. *FAA Role in Property Development Near Airports*

FAA oversees property development near airports in two ways. First, FAA requires, in exchange for federal funding, that airport sponsors ensure that land next to airports is used only for compatible purposes. Second, FAA reviews proposed construction for potential obstruction of flight paths.

### 1. Grant Assurances and Part 16 Enforcement

As the Government aptly explains in its brief to the court:

[A]irports that receive federal grants for "an airport development project" (known as airport sponsors) are subject to an array of ongoing statutory restrictions that are embodied in the terms of federal grants. 49 U.S.C. § 47107(a). Congress vested the Secretary of the Department of Transportation with broad authority to implement these restrictions in issuing grants pursuant to the Airport and Airway Improvement Act of 1982, s*ee id.* § 47101 *et seq.*, as delegated to the FAA Administrator, *see* 49 C.F.R. [§] 1.83(a)(9). FAA has implemented these statutory authorities through written grant assurances, which airport sponsors agree to follow on an ongoing basis if any part of an airport project is funded through the grant program.

As relevant here, one such obligation is embodied in Grant Assurance 21. *See* 49 U.S.C. § 47107(a)(10); Grant Assurance 21. That grant assurance requires airport sponsors "to take appropriate action, to the

extent reasonable, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft" and to "not cause or permit any activity or action thereon which would interfere with its use for airport purposes." *See*, *e.g.*, [Joint Appendix ("J.A.") 83] (emphasis omitted) (quoting Grant Assurance 21). FAA guidance recognizes that the types of actions that an airport sponsor might be expected to take will depend on the degree to which the sponsor has direct control over zoning. . . .

Br. for Respondent 3-4.

FAA enforces compliance with grant assurances through "Part 16" enforcement. *See* 14 C.F.R. § 16.1; *see also* 49 U.S.C. § 47122(a). Part 16 proceedings can result in penalties for noncompliance, such as suspending grant payments, terminating grant eligibility, or mandating corrective action. *See* 14 C.F.R. § 16.109; *see also* 49 U.S.C. § 47111(e).

## 2. Hazard/No-Hazard Determinations

FAA also regulates property developers directly. Any party that "propose[s] . . . construction or alteration" that exceeds certain height limits must "file notice with" FAA. 14 C.F.R. § 77.9; *see also* 49 U.S.C. § 44718. Once notified, FAA "conducts an aeronautical study to determine the impact of [the] proposed structure," evaluating factors like "[t]he impact on arrival, departure, and en route procedures," "[a]irport traffic capacity," "[m]inimum obstacle clearance altitudes," and "[t]he potential effect on [air traffic control] radar, direction finders, [and] tower line-of-sight visibility."

14 C.F.R. § 77.29(a); *see also* 49 U.S.C. § 44718(b)(1).

Based on the results of its study, FAA "issue[s] a determination stating whether the proposed construction . . . would be a hazard to air navigation." 14 C.F.R. § 77.31(a); *see also* 49 U.S.C. § 44718(b)(2). "[W]hen the aeronautical study concludes that the proposed construction . . . will exceed an obstruction standard and would have a substantial aeronautical impact," FAA "issue[s] a Determination of Hazard to Air Navigation." 14 C.F.R. § 77.31(c). When a proposed construction "does not exceed any of the obstruction standards" or exceeds standards without a "substantial aeronautical impact," FAA "issue[s] a Determination of No Hazard." *Id.* § 77.31(d)-(e). All determinations state:

> This determination concerns the effect of this structure on the safe and efficient use of navigable airspace by aircraft and does not relieve the sponsor of compliance responsibilities relating to any law, ordinance, or regulation of any Federal, state, or local government body.

Procedures for Handling Airspace Matters, FAA Order No. JO 7400.2P § 7-1-4(a)(7)(c) (FAA Apr. 20, 2023).

## B. *The Approval Process for ModernWest's Proposal*

### 1. ModernWest's Proposed Development

ModernWest proposed a mixed-use development near Longmont's Vance Brand Airport. The development includes two project components, called ModernWest 1 and ModernWest 2. ModernWest 1 is a "combined commercial/industrial and multi-family residential

development," and ModernWest 2 is a "predominantly multi-family residential development." J.A. 182.

FAA issued Determinations of No Hazard for ModernWest 1 and 2. *Id*. Each determination stated that the proposals "do[] not exceed obstruction standards" and "would not be a hazard to air navigation." *See, e.g.*, J.A. 20, 23, 26, 29. However, the determination warned, as required by FAA regulations, that it "does not relieve the sponsor of compliance responsibilities relating to any law, ordinance, or regulation of any Federal, State, or local government body." *See, e.g.*, J.A. 21, 24, 27, 30.

## 2. The City's Permitting Process and FAA's Incompatibility Letters

The City preliminarily approved plans for ModernWest 1 in 2021. ModernWest submitted plans for preliminary approval of ModernWest 2 in 2023. After learning of the ModernWest 2 plans, the Airport Manager contacted an engineer in the local FAA office. The Airport Manager flagged that the City was considering an "apartment complex off the end of the runway" and asked if "planning like this [could] <u>potentially</u> be considered by . . . FAA as a violation of grant assurances." J.A. 35-36 (emphasis in original). The FAA engineer responded that the proposed developments "could be a violation of [G]rant [A]ssurance 21" and informed the Airport Manager that FAA would "draft a letter to the [C]ity to remind [it] of the [G]rant [A]ssurance." J.A. 35.

On June 13, 2023, FAA sent the City a letter "remind[ing] [it] of its contractual obligations with [FAA]." J.A. 38. FAA "view[ed] th[e] proposed [ModernWest 2] development as an incompatible land use and contrary to Grant Assurance #21." *Id.* The letter added that "[f]ailure to comply with the Federal

[G]rant [A]ssurance[] may result in . . . an order terminating eligibility for grants or suspending the payment of grant funds." *Id.*

Despite FAA's letter, the City preliminarily approved plans for ModernWest 2 on June 26, 2024. On July 2, 2024, FAA again wrote to the City. It noted that it "ha[d] had . . . conversations with City staff regarding the incompatibility of the development" and reiterated that ModernWest 2 was "contrary to Grant Assurance #21." J.A. 83. FAA acknowledged that the project had received a Determination of No Hazard, but it explained that the Determination "strictly relates to [the proposal's] impact to the FAA controlled airspace and is not an approval of the development." *Id.*

The FAA letters were not the only expressions of opposition to ModernWest 2. The Longmont Airport Advisory Board contacted the City urging it, "in the strongest possible terms[,] to vote against the proposed [development]." J.A. 294 (emphasis removed). The Board expressed concern about potential noise complaints by residents of the proposed apartment complex and increased risk to pilots and the public, as "there ha[d] been incidents in the past where aircraft have . . . ended up in the fields where [ModernWest 2] [was] proposed." J.A. 294-95. In addition, the Colorado Department of Transportation ("CDOT") informed the City that ModernWest 2 was incompatible with state grant assurances and could lead to the loss of state funding. J.A. 87.

Later that year, FAA informed the City that, in its view, construction of ModernWest 1 would also violate Grant Assurance 21 and potentially jeopardize the Airport's federal funding. J.A. 176, 179A. CDOT similarly found that ModernWest 1 would violate state grant assurances. J.A. 306.

### 3. The City's Permitting Decision

The City held a public meeting on August 27, 2024, to discuss the ModernWest proposal. During the hours-long meeting, community members asked the City to block the developments, which they feared would jeopardize future FAA and state funding for the airport; create safety risks for pilots, passengers, residents of the proposed apartment buildings, and members of the public; expose the City to liability for aviation accidents; and increase the volume of noise complaints.

On September 10, 2024, the City adopted a written resolution stating that ModernWest 2 "does not comply with applicable statutes, codes, ordinance, and regulations" and "does not meet . . . criteria set forth in [the] Longmont Municipal Code," including requirements that applications be "consistent with the comprehensive plan and the purpose of the code and zoning district," "propose[] development compatible with surrounding properties in terms of land use, site and building layout and design, and access," and "[m]itigat[e] . . . potential adverse impacts on surrounding properties and neighborhoods." J.A. 197-99 (third alteration in original) (citation omitted). The City gave four independent reasons for this determination: (1) ModernWest 2 "would violate the City's obligations to comply with rules and regulations prescribed by [FAA]"; (2) ModernWest 2 would violate rules and regulations prescribed by CDOT; (3) the City's independent "find[ing] that [ModernWest 2] is not compatible with surrounding properties and does not mitigate potential adverse impacts on surrounding properties"; and (4) "the reasons stated during the August 27, 2024 public hearing." J.A. 198.

This resolution effectively blocked ModernWest's entire

proposed development, not only the ModernWest 2 project component, as ModernWest has given no indication that it intends to pursue ModernWest 1 even if it cannot build ModernWest 2. And shortly after adopting this resolution, the City also referred the ModernWest 1 project to the Planning and Zoning Commission for a public hearing, noting that FAA's letters "constitute[d] a significant factor warranting further review." J.A. 349. ModernWest 1 has not yet received final approval.

### 4. FAA's Final Communication

ModernWest requested that FAA withdraw its letters to the City. This initiated an extensive correspondence between ModernWest and FAA in which FAA repeatedly emphasized that authority to approve property development lay with the City and recommended that ModernWest "work [directly] with the City." J.A. 223; *see also* J.A. 284. The correspondence concluded on April 30, 2025, when FAA sent an email to ModernWest stating:

> We have reviewed your letter. We also have reviewed the prior correspondence referenced in your letter. We also discussed this matter with you by telephone on January 23, 2025. The FAA's position remains unchanged.

J.A. 12. ModernWest now petitions for review.

## II. ANALYSIS

### A. *ModernWest Lacks Standing to Petition for Review*

We dismiss ModernWest's petition for review for lack of

standing. ModernWest has not satisfied its burden to show that the likely result of ordering FAA to vacate and withdraw its letters would be the City changing its mind and approving the proposed developments.

### 1. ModernWest Has Not Shown that a Favorable Decision Is Likely to Redress Its Injuries

"To maintain an action in federal court, [petitioners] must show they have suffered an 'injury in fact,' 'fairly traceable to the challenged action of the [respondent],' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision.'" *Johnson v. Becerra*, 111 F.4th 1237, 1243 (D.C. Cir. 2024) (third alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). When a petitioner "is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *Lujan*, 504 U.S. at 561-62). But "[w]hen the [petitioner] is not the object of a government regulation," the law requires more. *Id*. In such cases, "causation and redressability . . . depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief," *id.*, which makes it "substantially more difficult" for petitioners to satisfy their burden of establishing standing, *Bennett v. Donovan*, 703 F.3d 582, 587 (D.C. Cir. 2013) (citation omitted).

In this circuit, there are "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians Ass'n v. U.S. HHS*, 489 F.3d 1267, 1275 (D.C. Cir.

2007) (summarizing *Nat'l Wrestling*, 366 F.3d at 940-41). "First, standing exists where the challenged government action authorized conduct that would otherwise have been illegal." *Id.* And, "[s]econd, standing has been found 'where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress.'" *Id.* (quoting *Nat'l Wrestling*, 366 F.3d at 941). Only the second category is at issue in this case.

In *National Wrestling*, we relied on three Supreme Court decisions to emphasize that petitioners have the "burden . . . to adduce facts showing that [the independent choices of the regulated third party] have been or will be made in such manner as to produce causation and permit redressability of injury." *Nat'l Wrestling*, 366 F.3d at 938 (quoting *Lujan*, 504 U.S. at 562); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976); *Allen v. Wright*, 468 U.S. 737 (1984); *Warth v. Seldin*, 422 U.S. 490 (1975). "[M]ere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power.'" *Nat'l Wrestling*, 366 F.3d at 938 (quoting *Simon*, 426 U.S. at 44). To have the requisite "substantial evidence of a causal relationship" that "leav[es] little doubt as to causation and the likelihood of redress," *National Wrestling* explained, the record often looks like that of *Tozzi v. HHS*, 271 F.3d 301 (D.C. Cir. 2001), and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986), where plaintiffs "introduced affidavits and other record evidence demonstrating that [the third parties] opted to [act] as a direct result of the [government's] decision." *Nat'l Wrestling*, 366 F.3d at 941-42; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 116 (D.C. Cir. 1990) (finding "overwhelming evidence" of causation and redressability);

*Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994) (finding "formidable evidence"); *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000) (relying on affidavits to find causation and redressability).

There are no such affidavits or supporting record facts here. Just like the claimants in *National Wrestling*, and unlike those in *Tozzi* and *Block*, ModernWest has "nothing to substantiate [its] assertion that a decision from the court vacating [FAA's actions] will redress [its] injuries by altering [the City's] independent decision[] whether to [approve ModernWest's proposed developments]." *Nat'l Wrestling*, 366 F.3d at 939. Thus, there is no credible evidence to indicate that a favorable permitting decision is the predictable result of ModernWest's requested judicial relief.

*First*, in *National Wrestling*, "[e]ven if appellants prevailed on the merits in their challenge to the [agency action], [the underlying legal requirements] would still be in place." *Id.* at 939-40. Likewise, in this case the City will still remain bound to comply with Grant Assurance 21 even if FAA withdraws its letters. ModernWest's requested relief will not change the City's legal obligations under Grant Assurance 21, nor will it affect FAA's authority to initiate Part 16 enforcement proceedings against the City if FAA determines that the proposed developments, once built, violate the Grant Assurance. The City "would remain free to [block ModernWest's proposed developments]." *Id.* at 940.

*Second*, while there is no dispute that the City cited FAA's actions as one reason for blocking ModernWest's project, the record is clear that the City took into account other objections to ModernWest's proposal. In its formal written resolution

13

denying the ModernWest 2 application, the City stated that the proposed developments "d[id] not meet . . . criteria set forth in [the] Longmont Municipal Code," including that projects must be "consistent with the comprehensive plan and the purpose of the code and zoning district," "compatible with surrounding properties," and "mitigat[e] . . . potential adverse impacts on surrounding properties." J.A. 197-98 (citation omitted). The City went on to explain that it based its decision on, in addition to FAA's letters, CDOT's finding that the proposal "would violate . . . [its] rules and regulations"; the City's own finding that the proposal "is not compatible with surrounding properties and does not mitigate potential adverse impacts on surrounding properties"; and the "reasons stated during the August 27, 2024 public hearing," which included concerns about safety, litigation risk, and noise. J.A. 198.

ModernWest presents no evidence undermining the validity of any of the City's non-FAA rationales. It merely accuses CDOT of having "clearly copied FAA's letters," which falls far short of its burden. Pet'r's Reply Br. 14. And even if we credited ModernWest's arguments rebutting the City's reliance on CDOT's conclusion, ModernWest does not address the City's independent finding that the development was incompatible with surrounding land uses, nor does it respond to the Longmont community's strong opposition to approval, both of which the City relied upon.

The fact that considerations other than FAA's letters were in play makes this case different from *Tozzi* and *Block*, where "[t]here [was] nothing . . . indicating that the third parties . . . would have had reason to continue their injurious conduct unaltered in the absence of the challenged government action." *Nat'l Wrestling*, 366 F.3d at 943. ModernWest has given us no reason to believe that, if FAA withdrew its letters, the City

would abandon its other, independent rationales for refusing to authorize the development. Doing so is necessary for ModernWest to illuminate, as it must, a "predictable chain of events" that ends with a favorable permitting decision. *Diamond Alt. Energy*, 606 U.S. at 121 (citation omitted).

It is clear from the foregoing discussion that the lack of redressability dooms ModernWest's standing to pursue this action. ModernWest's argument seems to be that it has standing because the City had, in the early stages of the permitting process, looked favorably on ModernWest's proposal. *See* Pet'r's Reply Br. 15. However, this argument ignores the fact that some weighty non-FAA considerations against ModernWest's proposal did not come into play until after the City's initial consideration of the proposal. More issues, beyond FAA's letters, came to light, and negative public reactions surfaced. The City's final disposition of the matter indicates that withdrawing FAA's letters would not likely cause the City to return to its original position because other serious concerns, which the City never weighed in its initial consideration of ModernWest's proposal, now carry the day. At most, withdrawing the letters might give ModernWest "better odds" of a favorable outcome. *Nat'l Wrestling*, 366 F.3d at 939. But "ill-defined 'better odds' [are] not close to what is required" for redressability, *id.*, because they "require guesswork" about what the final outcome will be, *Hecate Energy LLC v. FERC*, 126 F.4th 660, 666 (D.C. Cir. 2025) (citation omitted).

## 2. ModernWest Never Argued Standing in Its Opening Brief

Finally, ModernWest's failure to provide evidence of standing also runs afoul of this circuit's requirement that

petitioners argue standing, and identify supporting evidence of standing, in their opening briefs. Circuit Rule 28(a)(7) states that, "[i]n cases involving direct review in this court of administrative actions, the brief of the . . . petitioner must set forth the basis for the claim of standing" by making "arguments and cit[ing] evidence establishing by a 'substantial probability' the claim of standing." D.C. Cir. R. 28(a)(7) (2025) (citation omitted); *see also SSM Litig. Grp. v. EPA*, 150 F.4th 593, 596 n.1 (D.C. Cir. 2025) (explaining the August 11, 2025 amendment to Rule 28(a)(7) to require "arguments and evidence establishing standing, regardless of whether standing is apparent from the administrative record"). It is not enough to "rest on bare assertions" of standing in an opening brief. *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 850 F. App'x 9, 12 (D.C. Cir. 2021) (citation omitted). A petitioner "must identify in the record evidence sufficient to support its standing." *Id.* (cleaned up).

ModernWest's opening brief contains only "bare assertions." ModernWest states, but does not argue, that it "suffered an 'injury in fact,'" the "injury is fairly traceable to . . . [FAA's] [l]etters," and "the injury would be redressed by FAA withdrawing the . . . [l]etters." Pet'r's Br. 31. It then lists, without argument, four cases in which petitioners had standing. *See id.* at 31-32. ModernWest does not cite any evidence in the record to substantiate its claim to standing, nor does it explain how it satisfies the heightened requirements for standing when challenging government regulation of a third party. "No reasonable reader of the principal [ModernWest] brief would walk away with a clear understanding of [ModernWest's] . . . chain of causation[] and how a decision of this court could redress th[e] [alleged] harms." *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 581 (D.C. Cir. 2025).

"[W]e occasionally excuse forfeiture and noncompliance with Rule 28(a)(7) for 'good cause.'" *Id.* at 582 (citation omitted). ModernWest does not argue that such "good cause" exists here, and we do not see any reason to excuse its failure to follow our rule. ModernWest has offered no evidence that it had a "reasonable belief that the opening brief was sufficient." *Id.* Nor does ModernWest's "reply brief flesh[] out a timely raised theory of standing and also make[] standing patently obvious and irrefutable." *SSM Litig. Grp.*, 150 F.4th at 596 (citation omitted). As we have already explained, ModernWest's claim to standing, far from being "patently obvious and irrefutable," actually falls short of what the controlling caselaw requires.

Our "past cases have almost universally dismissed petitions when we have found a violation of Rule 28(a)(7)." *Entergy Ark.*, 134 F.4th at 583. We follow suit here.

### III. Conclusion

For the reasons stated above, ModernWest's petition for review is dismissed for lack of standing.

*So ordered.*